Lawrence J. BEECHER et al., Plaintiffs,

v.

Charles R. ABLE et al., Defendants.

Harry H. LEVY, Plaintiff,

v.

DOUGLAS AIRCRAFT COMPANY, INC., et al., Defendants.

Lillian GOTTESMAN, Plaintiff,

v.

A. V. LESLIE et al., Defendants.

Nos. 66 Civ. 3471, 66 Civ. 3382 and 66 Civ. 3775.

United States District Court, S. D. New York.

March 20, 1974.

See also, D.C., 49 F.R.D. 286.

**344**

Pomerantz, Levy, Haudek & Block by Abraham L. Pomerantz, Robert B. Block, A. Arnold Gershon, New York City, Lead Trial Counsel for plaintiffs.

White & Case by Haliburton Fales, II, Rayner M. Hamilton, Donald T. Mac-Naughton, New York City, for defendant Douglas Aircraft Company, Inc.

### Findings of Fact and Conclusions Of Law

MOTLEY, District Judge.

These actions, consolidated for trial, were commenced in 1966 and are brought on behalf of purchasers of a $75 million dollar issue of 4¾% convertible subordinated debentures due July 1, 1991. The debentures were sold pursuant to a registration statement and prospectus filed with the Securities and Exchange Commission and which became effective July 12, 1966. (Pl. Exh. 28).

The debentures were convertible into capital stock at $80 per share, subject to adjustment, and were subordinated to the payment of all other debt. Plaintiffs claim that the prospectus was filed in violation of Section 11 of the Securities Act of 1933, as amended. 15 U.S.C. § 77k. That section provides a cause of action for persons who have purchased securities pursuant to a registration statement and prospectus which contained " . . . an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading" and who at the time of purchase did not know of the untruth or omission. The court directed that the trial of these Section 11 claims would be bifurcated. The first part of the trial would adjudicate questions concerning the nature of the representations in the challenged prospectus, whether these representations contained untrue statements or omissions and whether any such untrue statements or omissions were material. The first phase of the trial was completed on October 25, 1973.

Douglas was incorporated in Delaware in 1928. At the time of the prospectus its corporate offices were located in Santa Monica, California. Douglas was an aerospace manufacturer engaged in the manufacture of aircraft and related activities. It was a major participant in the Government's missile and space programs and one of the principal manufacturers of jet aircraft for commercial and military use. Douglas was organized into two primary groups: the Missiles and Space Systems Group and the Aircraft Group. (Pls' Exh. 28, p. 3). In April, 1967, following a financial debacle in November 1966, Douglas merged with McDonnell Company, now known as McDonnell-Douglas.

Despite a pre-tax loss of $7,517,000 and a net loss of $3,463,000 for the three months ended May 31, 1966, Douglas had a net income of $645,000 for the period November 30, 1965 through May 31, 1966, that is, the first half of fiscal 1966. However, by November 1966, the end of fiscal 1966, Douglas had sustained a net loss of $52 million. This loss was attributable to the Aircraft Division's pre-tax loss of approximately $77.0 million. The Aircraft Division's catastrophic losses were, in turn, caused by the confluence of two factors: 1) unusually long delays in the delivery of parts, particularly engines, required for the DC-8 and DC-9 aircraft and 2) the escalating costs involved in recruiting and training thousands of new, inexperienced employees who replaced skilled or recently trained Douglas workers who had been either drafted or left for other

jobs in a highly fluid labor market. The severe parts shortage, and the high rate of turnover of skilled employees were caused, in turn, by the vagaries of the Vietnam War. (See Pls' Exh. 12, App.C, pp. 3–4;[1] Pls' Exh. 28, pp. 5–6; Tr., Oct. 9, 1973, pp. 300–315). Delays in parts deliveries by suppliers and the shortage of skilled workers caused serious disruptions to Douglas' production operations, resulting in vastly increased production costs. (Pls' Exh. 28, p. 23). These problems had begun to affect the Aircraft Division's operations in the early part of fiscal 1966. However, the parts shortages intensified during the second half of fiscal 1966. For instance, beginning in late July 1966, engine deliveries declined sharply. (Tr., Oct. 10, 1973, p. 610. See also Def's Exh. 711, p. 5). Moreover, in the middle or late summer of 1966, Douglas learned that the Defense Department was ordering a large supply of bomb racks from Douglas. (Tr. Oct. 24, 1973, pp. 1874–75; Def's Exh. 716B, p. 8). This order, to which Douglas had to give priority, worsened Douglas' manpower and parts shortages problems.

Plaintiffs claim that the prospectus contained material misrepresentations as follows:

1) The projected income statement in the prospectus that " . . . it is very likely that net income, if any, for fiscal 1966 will be nominal," (Pls' Exh. 28, p. 6) was, according to plaintiffs, a prediction that Douglas would break even and, as such, was a material misrepresentation of Douglas' prospects. In this connection plaintiffs argue that the prospectus falsely assured investors that Douglas would not have to correct the problems cited above and delineated in the prospectus in order to break even for fiscal 1966. Plaintiffs further

argue that Douglas should have disclosed a) the assumptions underlying the forecast, and b) that previous forecasts in 1966 had failed in order to make the statement regarding profits, if any, not misleading.

2) Douglas' statement of the use to which it would put the net proceeds of the bond issue (Pls' Exh. 28, p. 3) did not accurately state the company's plans for the proceeds. Plaintiffs say Douglas used all proceeds to pay off short term bank loans but misrepresented that only a portion of the proceeds would be used to cancel these loans.

Plaintiffs also claim that failure to disclose Douglas' pre-tax loss of $7,517,000 was a material omission.

■ In order to prove a violation of Section 11, it is not enough to prove untrue statements, misrepresentations or omissions. An untrue statement or a misrepresentation or omission must be material in order to be actionable under Section 11. And the test of materiality is whether " . . . a reasonable investor might have considered . . . [the information] important in the making of . . . [his] decision." Affiliated Ute Citizens v. United States, 406 U.S. 128, 153–154, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). *See also* Escott v. Barchris Construction Corp., 283 F.Supp. 643 (S.D.N.Y. 1968) (McLean, J.). As the Court of Appeals for the Second Circuit has said:

"The basic test of materiality . . . is whether a *reasonable* man would attach importance . . . in determining his choice of action in the transaction in question . . . . [Citations omitted] This, of course, encompasses any fact '. . . which in reasonable and objective contemplation *might* affect the value of the cor-

1. "Memorandum in Support of the Validity of the Merger between Douglas Aircraft Company, Inc. and McDonnell Company," dated February 23, 1967, and prepared on behalf of Douglas.
The court has ruled that documents and data prepared after July 12, 1966, the effective date of the prospectus, would be admissible if they cast light on defendant's economic condition at the time the prospectus became effective. See Memorandum Opinion and Order, dated September 26, 1973.

poration's stock or securities . . . '."

SEC v. Texas Gulf Sulphur Co., 401 F. 2d 833, 849 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). *Scienter* is not an element of a Section 11 action. 3 L. Loss, Securities Regulation 1729–30 (2d ed. 1961). *See also* Fischman v. Raytheon Mfg. Co., 188 F.2d 783, 786 (2d Cir. 1951).

■ Moreover, the "due diligence" defense is not available to this defendant. That defense permits persons other than issuers to escape liability if they can show that, after reasonable investigation, they had reasonable grounds to believe and did believe that the prospectus was true and did not contain any material misrepresentations or omissions. 15 U.S.C. § 77k.

With these basic legal principles in mind, and as the remainder of this opinion demonstrates, the court considered each of plaintiffs' claims to determine whether they have sustained their burden of proving with respect to each claim an untrue statement or omission or misrepresentation as well as materiality.

As to the first claim, the court finds and concludes herein that the statement concerning income, if any, was false in that, viewed as a prediction of break even (i. e., a little profit or a little loss) it was not highly probable that the company would break even and the statement was misleading in that it omitted to state facts necessary in order to make that prediction not misleading. It was manifestly material since it represented top management's assessment of the company's prospects despite omnipresent adversity.

The court also finds that plaintiffs satisfied their burden of proof with respect to their claims that the statement as to the use of proceeds was a material misrepresentation and failure to disclose the pre-tax loss of $7,517,000 was a material omission.

The plaintiffs' claims are examined below and the court makes the following findings as to each.

I. *"While it is not possible to determine when these factors will be corrected, it is expected that they will continue to affect the results of operations for the balance of fiscal 1966. Therefore, it is very likely that net income, if any, for fiscal 1966 will be nominal."* (Pls' Exh. 28, p. 6).

Plaintiffs claim that this statement amounted to a forecast that defendant would break even in fiscal 1966 and that this is the way a reasonably prudent investor would have read the statement. Defendant claims that the statement was intended as a warning that profits, if any, for 1966 would be nominal. Moreover, says Douglas, while it did not intend to predict that it would break even in fiscal 1966, its management reasonably believed that it would incur only nominal losses. Its expectation of nominal losses was based on its in house prediction that the Aircraft Division would have a pre-tax loss of $27.8 million and that the company would have a net loss of $519,000 for the fiscal year.

The parties have stipulated that it was not illegal for defendant to make a prediction of future earnings in its prospectus.[2] The threshold question, therefore, is whether the statement would have been interpreted by a rea-

---

2. Tr. Feb. 21, 1973, p. 69.

The court notes that the SEC has taken the position that issuers should avoid making forecasts, projections, or predictions in prospectuses. "Guidelines for the Release of Information by Issuers Whose Securities Are in Registration," Securities Act Release No. 5180, Aug. 31, 1971, CCH Federal Securities Law Reporter ¶ 78,192 (1970–'71 Transfer Binder).

The SEC has recently announced that it is reconsidering that policy and that regulations governing projections will be promulgated. "Statement by the Commission on Disclosure of Projections of Future Economic Performance," Securities Act Release No. 5362, Exchange Act Release No. 9984, Feb. 2, 1973, CCH Federal Securities Law Reporter ¶ 79,211 (1972–'73 Transfer Binder).

sonable investor merely as a warning that more than nominal profits were unlikely for fiscal 1966, as defendant has argued,[3] or as a forecast that the company would not suffer any substantial losses, as plaintiffs contend.

The statement, of course, literally speaks only of the *improbability* of substantial earnings and *not* of the *improbability* of substantial losses. "However, a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor . . . may properly . . . be considered a material misrepresentation." SEC v. First American Bank and Trust Co., 481 F.2d 673 (8th Cir. 1973). *See also* 3 L. Loss, Securities Regulation, 1431–35 (2d ed. 1961).

Put another way, the test is whether it is likely that an appreciable number of ordinarily prudent investors would have read the statement as a forecast that substantial losses were improbable. *Cf.* Maternally Yours v. Your Maternity Shop, 234 F.2d 538, 542 (2d Cir. 1956).

■ The court finds that it is likely that an appreciable number of ordinarily prudent investors would have so read the passage and that such a reading was likely despite the various admonitions in the prospectus. (See Pls' Exh. 28 at pp. 8, 9, 14–16, 18, 20, 22–23, 23–24).

First, while the canon of construction "*expressio unius est exclusio alterius*" is not infallible, reasonable investors could have concluded that the company's failure to mention the likelihood of substantial losses together with its reference to the improbability of substantial profits was meant to exclude the likelihood of substantial losses.

Second, the enumeration of conditions which might cause reasonable investors to be uncertain about the company's earnings prospects would not necessarily cause reasonably prudent investors to discard the possibility that the company intended to make a break-even forecast.

In view of the company's net income of $14,598,000 for fiscal 1965 (Pls' Exh. 28, p. 4), reasonably prudent investors might have concluded that, even if the unfavorable conditions cited throughout the prospectus caused a substantial decline in Douglas' earnings, nevertheless the company considered any substantial losses improbable for fiscal 1966.

Defendant now concedes that reasonable investors " . . . would have the impression that Douglas was not expecting any great loss," (Tr., Oct. 19, 1973, pp. 1660–61) and that the statement " . . . accurately describe[d] the Company's second 1966 quarter internal financial expectations for the year 1966: [t]he possibility of a slight profit or a slight loss." (Defendant's Proposed Findings of Fact ¶81 (e).) Moreover, Donald W. Douglas, Jr., testified that he intended that the statement would suggest that "[t]here might be a small loss and there might be a small gain". (Tr., Oct. 9, 1973, p. 393). One of defendant's witnesses, Dean Woodman, a vice president of Merrill, Lynch, Pierce, Fenner & Smith, testified that he understood the language to mean that any losses would be nominal. (Tr., Oct. 12, 1973, p. 866). The court finds that a net loss of more than $5,000,000 or $1.00 per share for fiscal 1966 would be substantial, (Tr., Oct. 12, 1973, p. 858), so that a reasonably prudent investor, aware of the possibility of such a loss, might have been deterred from purchasing the debentures.

### Standard of Care for Earnings Projections

Since we are talking about a forecast and the parties have stipulated that forecasts in prospectuses are not illegal, the next inquiry must be whether this break-even forecast was reasonably based, as Douglas contends, or whether as plaintiffs contend, it was unreasonable to conclude that it was highly probable that substantial losses could be avoided for fiscal 1966, despite the

---

3. "[W]hat is involved here is a cautionary statement to investors." Trial Memorandum of Defendant McDonnell Douglas Corporation 6.

shocking $7,500,000 pre-tax loss at the end of the second quarter.

Plaintiffs, concede that an earnings forecast is not actionable merely because the facts do not turn out as predicted. Additionally, projections, unlike other statements contained in a prospectus, will not often be clearly true or false. Forecasting is an art and the weight to be attached to the many variables which should be considered in assessing a corporation's future prospects is largely a matter of judgment. However, investors are likely to attach great importance to income projections because they speak directly to a corporation's likely earnings for the future and because they are ordinarily made by persons who are well-informed about the corporation's prospects. Therefore, in view of the policy of the federal securities laws of promoting full and fair disclosure, a high standard of care must be imposed on those who, although not required to do so, nevertheless make projections.

Consequently, this court holds that an earnings forecast must be based on facts from which a reasonably prudent investor[4] would conclude that it was highly probable that the forecast would be realized. Moreover, any assumptions underlying the projection must be disclosed[5] if their validity is sufficiently in doubt that a reasonably prudent investor, if he knew of the underlying assumptions, might be deterred from crediting the forecast.[6] Disclosure of such underlying assumptions is ". . . necessary to make . . . [the forecast] . . . not misleading. . . ." 15 U.S.C. § 77k(a).

Factors bearing on the reasonableness of a forecast would include the corporation's record of success in fore-casting earnings, the care exercised in the preparation and review of cost and sales estimates, doubts expressed by persons engaged in the process of review, the reasonableness of the underlying assumptions, and any facts not known to management which were accessible in the exercise of reasonable care.

In this connection, the court finds that defendant had some basis for concluding that it would not have substantial losses for fiscal 1966.

1. From 1961 through 1965, the company's annual income forecasts had been reasonably accurate. (See Def's Exh. 230).

2. Defendant's annual income forecasts were re-checked each quarter. Each division of the company would re-forecast its expected income for the fiscal year. These quarterly forecasts were then checked by the corporation's financial department. The Aircraft Division's cost estimates contained in its second quarter forecast were checked by an independent analysis conducted by the corporate cost estimating group, Department G–31. While Department G–31's cost estimates were greater than those of the Aircraft Division, the difference was within the normal acceptable range of tolerance and the company could conclude that Department G–31's estimates tended to confirm the Aircraft Division's forecast. Moreover, the company could reasonably conclude that the Aircraft Division's estimates were to be preferred over those of Department G–31 since the Aircraft Division's cost estimating techniques were more elaborate. (Tr., Oct. 23, 1973, pp. 1831–32).

3. The cost accounting system employed by Douglas required that as soon as its quarterly reviews indicated that aircraft would be sold at a loss, current financial statements were charged for

---

4. *See* Merrifield, Projections in SEC Filings, Part V, New York Law Journal, Dec. 14, 1973, p. 3.

5. *See* "Statement on the Disclosure of Projections of Future Economic Perform-

ance," CCH 1972-'73 Decisions Federal Securities Law Reporter ¶ 79.211 at p. 82,665.

6. All projections will be based on numerous assumptions, some of which are so reasonable and so likely to be borne out by the facts that they may be left unstated.

the anticipated losses, even though the aircraft might not be delivered until subsequent financial reporting periods. This had the effect of reducing the losses which would have to be recognized during subsequent periods. (See, e. g., Tr., Oct. 17, 1973, pp. 1266–1274).

4. The company, as a result of delays in deliveries of parts for the DC–8 and DC–9, decided in early June, 1966 to defer a number of DC–8 and DC–9 deliveries until fiscal 1967. Defendant could reasonably conclude that, with fewer airplanes to deliver in fiscal 1966, the parts shortages would be less severe, employees on the assembly line could be more productive, and fewer new, inexperienced workers would be required.

5. Defendant, moreover, could conclude from its experience with military aircraft that as employees became more experienced and as the number of new employees was reduced, production efficiencies were likely to improve. (E. g., Def's Exhs. 473, 482, 527).[7]

6. Management, prior to issuance of the prospectus, had taken several other steps to correct the Aircraft Division's problems. A second source of landing gears for the DC–9 program had been obtained in late 1965. (Tr., Oct. 23, 1973, p. 1725). Defendant had acquired de Havilland Aircraft Company of Canada, Ltd., manufacturer of the DC–9 wing, and the performance of the Canadian subsidiary (DACAN) has subsequently improved. (Tr., Oct. 23, 1973, pp. 1723–24). Other steps were taken to assure new sources of supply for parts and financial support had been given to some subcontractors.

7. In addition, steps were taken to index the location of parts (Tr., Oct. 18, 1973, p. 1422), to direct parts deliveries to appropriate destinations on the assembly floor more efficiently, (Tr., Oct. 18, 1973, p. 1423), and to tighten super-

vision over assembly line workers. (Tr., Oct. 18, 1973, p. 1426).

8. Defendant's assembly performance charts (Pls' Exhs. 18–A, 18–B), prepared by the Aircraft Division, had shown a bottoming out and upward trend for approximately eight weeks prior to June 24, 1966. Since this upward trend coincided in time with some of the steps taken by management to improve productivity, management could reasonably conclude that conditions in the Aircraft Division were improving. However, in view of previous similar improvements in assembly performance which were followed by steep declines in productivity, management could not reasonably conclude with any certainty that the then current upward trend would necessarily continue.

9. Donald W. Douglas, Jr., president of Douglas, had been advised by a "very senior man of the Department of Defense" in the spring of 1966 that the Department would not be ordering more of Douglas' A 4 dive bombers because ". . . we are not going to end up at the end of this war with a surplus." (Tr., Oct. 11, 1973, pp. 648–9). Such advice from the Defense Department would give defendant some basis for believing that the damaging impact of the Vietnam War on the company's manpower and parts' supplies would be reduced by the end of fiscal 1966. However, taking into account past uncertainties surrounding foreign policy, defendant could not be sufficiently confident that the war would end soon or that its impact on the company's earnings would soon be mitigated.

■ The court, however, finds that reasonably prudent bond purchaser would not have concluded, from the facts available to Douglas' management at the time the prospectus was issued, that it was highly probable that the forecast

---

7. Defendant, however, could not expect a duplication of its experience with military aircraft since military airplanes had priority in Government allocations of scarce parts and one of Douglas' problems during the period of the Vietnam War was obtaining parts for its civilian airplanes.

would be satisfied in that substantial losses would be avoided in fiscal 1966 for the following reasons:

1. All previous forecasts made in fiscal 1966 had failed as shown in the following table:[8]

DEFENDANT'S EARNINGS PROJECTIONS
FOR FISCAL 1966

| Date of Projection | Estimated After Tax Earnings for Fiscal 1966 | Per Share |
|---|---|---|
| Feb. 15, 1966 | $19.2 Million | $4.15 |
| Apr. 12, 1966 | $16.9 Million or $21.5 Million | $3.22 or $4.11 |
| May 31, 1966 | $10.5 Million | $2.01 |
| June 17, 1966 | $470,000 loss | $.09 loss |
| June 19, 1966 | Loss of $26,000 or alternatively $994,000 earnings or alternatively $2.27 Million loss | Loss of $0.00 per share or earnings of $ .19 or loss of $ .43 per share |
| June 21, 1966 | $6,000 earnings or $1.026 Million earnings or $2.24 Million loss | $0.00 earnings or $ .20 earnings or $ .43 loss |
| June 24, 1966 | $662,000 earnings | $ .12 |
| July 8, 1966 | $519,000 loss | $ .10 loss |

2. Most significantly, Douglas reported a net loss of $3.463 million and a pre-tax loss of $7.517 million for the second quarter ending May 31, 1966. Net income for the quarter was, therefore, $10.53 million less than Douglas had projected in its Profit Plan. (Pls' Exh. 53, p. 1).

3. These results were reported to management in mid-June, 1966 and were considered very disappointing. (Tr., Oct. 12, 1973, p. 815). And these forecasting failures were due to a bedeviling inability to accurately predict assembly line performance on the DC–8 and DC–9

during the first half of fiscal 1966.[9] These continuous forecast failures, for so long a period of time, i. e., half a year, should have put defendant on notice, at the time the prospectus became effective, either that its financial forecasting machinery was inadequate or, more likely in view of its success in forecasting income in prior years,[10] that conditions in fiscal 1966 were so unsettled as to make any projections uncertain.

4. Moreover, the shocking, unanticipated decline in Douglas' earnings for the second quarter should have put management on notice that forecasts were risky and that, unless the conditions which produced the second quarter results, especially the parts shortages, (see Pls' Exh. 28, pp. 5–6), were actually corrected, results during the remainder of 1966 might be equally disappointing.

Conditions in the aerospace industry were gravely unsettled during fiscal 1966 rendering income forecasting uncertain. The Vietnam War had resulted in acute shortages of manpower and essential parts. (See, e. g., Tr., Oct. 5, 1973, p. 288; Tr., Oct. 9, 1973, p. 302). Because future availability of manpower and parts would depend largely on the progress of the War, a matter about which predictions were plainly risky, earnings forecasts for fiscal 1966 would likewise be uncertain. While defendant had taken several steps to deal with its problems,[11] solutions of some of the most serious problems were simply beyond Douglas' control. Defendant obviously could not complete assembly of its commercial airplanes without engines and Douglas had only one source of engines—Pratt & Whitney. That source had failed repeatedly and for several months prior to

---

8. The table is derived from Plaintiffs' Exhibit 72, ¶ 50 (Defendant's Answers to Interrogatories, Series D).

9. See Plaintiffs' Exhibits 81 and 82. These charts show the rate of assembly performance efficiency that was required, if all other factors remained as predicted, in order to achieve the income forecasts made for the

first, second, third and fourth quarters. The charts show that for both the DC–8 and DC–9, actual performance fell far short of anticipated performance in fiscal 1966 during the time leading up to July 12, 1966, the effective date of the prospectus.

10. See p. 348 supra.

11. See p. 349 supra.

the effective date of the prospectus to meet its firmest commitments. Several members of Douglas' management have themselves admitted that forecasting was difficult in fiscal 1966. According to the minutes, Mr. Douglas stated at a board meeting on July 8, 1966 that he was " . . . in no position to forecast what results might be obtained in the third and fourth quarters of F Y 1966 since so much depended upon recovery of production efficiency." (Pls' Exh. 25, p. 9). Albert V. Leslie, retired Executive Vice President of Finance, testified on his deposition that estimating income was more difficult in fiscal 1966 because of the " . . . adverse changes that were taking place within the company at that time," and that new estimating procedures were required. (Def's Exh. 419, p. 59).

5. Defendant made no provision in its forecast for $6.4 million in additional costs which might be charged to the Aircraft Division for fiscal 1966 by the company's Canadian subsidiary (DACAN). Charles Gollihar, Vice President of Finance at the Canadian subsidiary, had advised the Aircraft Division that estimated prices for work DACAN was doing on the DC–9 program would be substantially greater than the Aircraft Division's cost estimates. Apparently, DACAN's cost estimates were greater than the Aircraft Division's for some airplanes and lower than the Aircraft Division's for others. DACAN's higher cost estimates were attributable to planes scheduled for delivery in 1966. Accordingly, the DACAN figures would have resulted in greater costs of approximately $6.4 million for 1966 and lower costs of approximately $10.4 million for fiscal 1967. According to Richard A. Bibee, Manager of the Cost Accounting and Financial Forecasting Departments

at the Aircraft Division, the DACAN figures were not used since he did not have firm prices from DACAN. "I had no reason really to use them until they were firmed and checked out." (Tr., Oct. 19, 1973, p. 1612). In the absence of a careful investigation by the Aircraft Division as to whether the higher DACAN cost estimates for 1966 were correct, the company could not reasonably be confident that its own cost estimates were correct.

6. Substantial and sustainable improvements in the Aircraft Division's performance were required in order to avoid substantial losses for fiscal 1966. Management, in projecting a $500,000 net loss for fiscal 1966 in its internal forecasts at the end of June, assumed that performance on its DC–8 and DC–9 would rise from 46% and 47%, the levels recorded for the DC–8 and DC–9 for the week ending June 24, to levels of approximately 65% for both airplanes by November 30, 1966. That defendant assumed these levels of improvement in forecasting a nominal loss is supported by a consideration of all the evidence and by the captions it supplied these projected improvements in assembly performance on the charts it prepared in 1966 since the lines are referred to as "performance required to meet forecast." (Pls' Exhs. 81, 82). As defendant argued, it obviously was not necessary that assembly performance rates rise to the precise levels predicted in order to avoid substantial losses, since other factors in the company might turn out better than anticipated, and since lower performance rates would be consistent with an insubstantial loss for the fiscal year.[12] Nevertheless, defendant has not shown that it had a reasonable basis to believe that there would be sufficient cost reductions or such greatly improved

---

12. The Assembly Performance charts showed the improvements management considered necessary in order to meet its forecast that the company would have a net loss of $519,000 for the fiscal year. See pp. 346–347, *supra*. However, the court has found that only a net loss of $5 million or more

would have been considered substantial by the ordinary, prudent investor. See p. 347, *supra*. Therefore, it was not necessary for the company to match the precise levels forecast in the charts in order to avoid substantial losses.

prospects in other aspects of Douglas' operations to offset any significant failures to meet the anticipated levels of assembly performance. That large improvements in assembly performance were required in order to avoid substantial losses is shown by the chart prepared by William E. Jenne, Director of Operations Control at the Aircraft Division, and Harold E. Showalter, Vice President, Financial Management at the Aircraft Division, at the request of Jackson R. McGowen, then Group Vice President-Aircraft and a director of Douglas. (Tr., Oct. 24, 1973, p. 1880). The chart was designed to show the impact that various assumptions regarding assembly performance would have on the Aircraft Division's income for the fiscal year. The chart shows that even if performance on the DC–8 and DC–9 rose to 50% for the period June 1, 1966 through November 30, 1967, the Aircraft Division would lose $37.9 million in fiscal 1966, or approximately $10 million more than the estimated loss for the Aircraft Division, which estimated loss was the basis for defendant's belief that its losses would be nominal. (Pls' Exh. 35). Therefore, in the absence of large, unanticipated gains in areas of Douglas' operations other than assembly, significant improvements in assembly performance were required in order to avert substantial losses.

7. Douglas' projection that assembly performance would improve to the levels indicated in Plaintiffs' Exhibits 81 and 82 was in turn based on assumptions that some of the problems besetting the Aircraft Division would be partially resolved. The company, for instance, assumed that a "stabilized labor force," resulting from fewer additions of less skilled workers would result in "improved efficiency and lower unit costs." (Pls' Exh. 21, p. 2). Mr. Douglas testified that there was an assumption that Pratt & Whitney would meet the new engine schedules which promised increased production. (Tr., Oct. 9, 1973,

p. 333). Finally, as Douglas testified, the company assumed that " . . . the tremendous number of corrective actions we had taken to improve the manufacturing system, the new people we brought in, the new systems we introduced, the second source sub-contractors we introduced, the great diversion of manufactured parts to thousands of outside concerns" would help the company reach the projected levels of assembly performance. (Tr., Oct. 9, 1973, p. 339. See also Tr., Oct. 11, 1973, p. 683; Tr., Oct. 12, 1973, pp. 862, 883–886; Tr., Oct. 24, 1973, p. 1967).

While the court has found that defendant might reasonably have given some weight to the steps it had taken to correct its problems, the prospects of making improvements sufficient to avoid substantial losses were far too uncertain to warrant a forecast which included the suggestion that Douglas would have no substantial losses in fiscal 1966.[13]

Indeed, members of Douglas' management were themselves uncertain that improvements would materialize sufficiently to avoid substantial losses. Mr. Douglas, in a report to the board of directors on July 8, 1966, stated:

"During the period 6–1–66 to 6–13–66 the Aircraft Division completed their analysis of probable costs to complete the DC–8s and DC–9s to be delivered in fiscal 1966. This was reviewed and forwarded to the Corporate Controller on 6–13–66. The Controller determined that input from other divisions indicated a probable break-even or slight loss for 1966 based primarily on the Aircraft Division's forecast inability to do better than a 27 million dollar pre-income tax loss. . . .

\* \* \* \* \* \*

"After . . . consultation it was decided that Mr. Leslie [in 1966 the Executive Vice President-Finance and a director of Douglas] would muster a team of the best qualified people in the company to review the work

13. See pp. 350–351 *supra*.

done by the Aircraft Division. This work was accomplished during the weekend of 6–18 and 6–19–66 . . . The result was: (1) No substantial change in the probabilities as presented by the Aircraft Division and (2) *a fair possibility of even greater loss.*" (Pls' Exh. 25, pp. 5–6) (Emphasis added).

A report prepared in late June, 1966 by Robert A. Hall, who was Vice President, Pricing and Information Systems, commenting on the differences between the cost estimates of the corporate finance office and the Aircraft Division [14] stated:

> "*It should also be kept in mind that both sets of estimates contain a degree of optimism, in that they assume a recovery from present levels of unit cost.* In the case of the DC–8, for example, the recovery in Manufacturing hours is assumed by G–31 [the corporate finance office] to start at the 290th airplane. The A.D. [Aircraft Division] forecast assumes a similar recovery, but starting at the 265th airplane. This results in a higher G–31 forecast, but nevertheless *one which could be too low if costs continue to rise, if the recovery does not begin by the 290th unit, or if the recovery curve is flatter than assumed.*" (Pls' Exh. 36, p. 2). (Emphasis added).

On July 20, 1966, Harold E. Schowalter, Vice President, Financial Management, Aircraft Division, in a report prepared by William Jenne, director of operations control, stated:

> "I must emphasize that the 2nd Quarter projections were ambitious in the face of the actual trends occurring at the time of the forecasts for both assembly cost and schedule.
>
> * * * * * *
>
> " . . . [W]hile assembly costs to date have shown some improvement, I do not feel strongly *yet* that it will continue to do so consistent with the

2nd Quarter forecasts until such time that I have more evidence of that, and also until the parts supply, outside production and Engineering conditions begin to show definite signs of recovery. Therefore, it is my opinion at the present time that accomplishing the current forecasts will be a difficult task, certainly for this fiscal year, and very possibly next year, as well. I do not expect, however, to have a large swing in our profit-loss situation as occurred during the 1st and 2nd Quarter forecasts for 1966 or 1967." (Pls' Exh. 18, p. 4).

The court assumes that Mr. Jenne was referring to the difficulties in achieving the assembly performance forecasts rather than the over-all corporate forecasts (Tr., Oct. 19, 1973, p. 1578). Mr. Jenne's uncertainty expressed shortly after the effective date of the prospectus about the likelihood of meeting the assembly performance estimates would have caused reasonable, objective persons to doubt that it was highly probable that only nominal losses would be suffered in fiscal 1966 in view of Mr. Jenne's significant role in preparing the assembly performance estimates (Tr., Oct. 16, 1973, pp. 1134, 1140) and the importance of at least substantially meeting the projected improvements in assembly performance. [15]

Moreover, defendant recognized that some of the factors which had resulted in the severe losses reported for the second quarter were beyond Douglas' control. (Pls' Exh. 43, p. 1) ("While some of the factors contributing to the higher cost trends are outside the control of the Company, management has taken such steps as it considered necessary to improve the operating results of the Aircraft Division.")

A reasonable, objective person would, therefore, have concluded that there was a fair possibility that some of the conditions which were beyond Douglas' control, such as failure of its engine supplier to meet its commitments, might

14. See pp. 348–349 *supra.*

15. See pp. 351–352 *supra.*

continue to deteriorate sufficiently to offset any of the steps management had taken to improve production efficiency.

The court further finds that a reasonable investor could have read the income, if any, passage to mean that no improvement, or at least no substantial improvement, in the various adverse conditions besetting the Aircraft Division and discussed at pages 5–6 of the prospectus would be required in order for the company to avoid more than nominal losses.

While defendant has argued that the statement meant only that it was impossible to determine when the adverse factors would be resolved, rather than merely improved, a more plausible reading of the passage would be that no material changes in those factors would be necessary. In view of the court's findings above, this statement was misleading. Moreover, the statement was material since reasonable investors would be much more confident that Douglas would not have substantial losses if they had been led to believe that no substantial improvements were required to avoid such losses.

Finally, with regard to the income, if any, statement, the court finds that Douglas was required to disclose that the forecast was based on an assumption that conditions in the Aircraft Division would have to improve before the company could expect to avoid substantial losses and that earlier forecasts in 1966 had to be modified.[16] Disclosure of these facts was required in order to make the statement about the defendant's earnings prospects not misleading.

The assumption that conditions would improve sufficiently for the company to avoid substantial losses was material since the assumption was sufficiently doubtful that reasonable investors, had they been informed of the assumption, might have been deterred from crediting the forecast.

The court similarly finds that disclosure of the fact that previous forecasts had failed was required since disclosure might have placed investors on notice either that Douglas' forecasting techniques were faulty or that the adverse conditions affecting the Aircraft Division made income forecasting unusually difficult. In either case, reasonable investors might have thereby been deterred from crediting the forecast.

The court cannot find that investors were given adequate notice of the failure of the prior forecasts by the following passage in the prospectus.

"The most recent in-depth analyses of costs incurred and likely to be incurred indicate that the costs of the early DC–9 aircraft are *greater than previously estimated*. The costs of recruiting, training, and assimilating the thousands of new employes in the Aircraft Group . . . are *proving to be greater than was used in prior cost estimates.*" (Pls' Exh. 28, p. 5) (Emphasis added).

This passage did not give investors sufficient notice that previous earnings forecasts for the company as a whole had failed. At most it might have suggested that certain costs had been greater than anticipated. It would not clearly advise the investor that prior income forecasts for the company had seriously over-stated income.

## II. *Use of Proceeds*

Plaintiffs contend that the following passage in the prospectus was misleading:

"Of the net proceeds from the sale of the Debentures, amounting to approximately $73,835,500, a portion thereof will be used to repay in full the short-term bank borrowings incurred under the open line of credit referred to under 'Capitalization.' These borrowings were principally incurred to meet increased cash requirements resulting from a build-up of work-in-

16. See pp. 349–350 *supra.*

process inventories. It is the Company's present intention to use the balance of the net proceeds to continue to finance the build-up of inventories principally associated with the production of commercial jet aircraft." (Pls' Exh. 28, p. 3).

The section of the prospectus entitled "Capitalization" in turn reported that Douglas had $30,400,000 of short-term borrowings outstanding under its $125,-000,000 open line of credit with eight banks." (Pl.Exh. 28, p. 6). The two passages, taken together, therefore, disclosed that, at most, $30,400,000 out of the total proceeds of approximately $73,-835,500 would be used to repay short-term bank borrowings.

Plaintiffs claim that this was misleading because, in fact, Douglas used substantially all of the proceeds to liquidate bank loans. Defendant argues, on the other hand, that while proceeds from the sale of the debentures, together with an advance received by the company, were used to eliminate the company's short-term bank loans, the proceeds also provided $65 million cash for short-term investment. (Def's Proposed Findings of Facts, ¶ 187).

Defendant further argues that since Douglas had an open line of credit of $125,000,000 with eight banks, proceeds of the debenture issue that were used to repay short-term loans would expand the credit available to finance the build-up of inventories.

It is clear that substantially all of the proceeds of the debenture issue were used to eliminate current liabilities. (See, e. g., Def's Exh. 716 A, p. 2; Pls' Exh. 12, p. 8).

The court further finds that defendant, at the time the prospectus was issued, intended to use substantially all of the proceeds to pay back short-term bank borrowings. In its Statement of Consolidated Financial Position, Douglas reported that, as of June 30, 1966, it had current liabilities of $84,559,000 but that these liabilities had been eliminated by July 31, 1966. (Pls' Exh. 80, p. 18). Since the current liabilities were eliminated within nineteen days of the effective date of the prospectus, it is inescapable that on the effective date defendant intended to so use the proceeds.

Defendant argues, however, that the open line of credit was like an accordion, in that money paid back could later be borrowed again for other purposes, including financing the build-up of inventories. Therefore, according to defendant, it was merely a technicality that the proceeds were used directly to eliminate current liabilities since defendant intended to borrow from its open line for financing inventory build-up later.

However, the court finds that it was more than a technicality that a large part of the proceeds, as indicated, were not directly used for financing inventory build-up. In view of the serious liquidity and production problems facing Douglas, it was manifestly uncertain that the company could later obtain large loans from the bank. Indeed, on October 10, 1966, Douglas' line of credit was suspended as a result of the sharp downturn revealed in its August 31 interim financial statement. (Pls' Exh. 12, pp. 8–9).

The court further finds that the misrepresentation was material. Purchasers of debentures, like other lenders, are interested in how borrowed funds will be used. A lender, if informed that a loan will be used to pay back other debts, is likely to be less optimistic about the financial health of the borrower and the prospects of repayment than he would be if the loan were to be used in part to maintain or expand the borrower's income producing operations.

In the instant case, investors, informed of Douglas' uncertain prospects (see Prospectus, Pls' Exh. 28, pp. 8, 9, 14–16, 18, 20, 22–23, 23–24), might reasonably have concluded that it was doubt-

ful that Douglas would later be able to use its line of credit to the extent required to finance inventory build-up. Therefore, had the prospective purchasers been informed that substantially all of the proceeds would be used to pay back bank loans, they might reasonably have been deterred from purchasing the debentures.

As noted above, the fact is that substantially all of the proceeds were used to repay the banks. This was because, contrary to the representations in the prospectus, a substantial portion of the proceeds was used to pay back the Canadian subsidiary's outstanding short-term borrowings in the amount of $44,459,322. Defendant, according to the prospectus, had only $30,400,000 in short-term borrowings outstanding under its open line of credit. (Pls' Exh. 28, p. 6). Since the Canadian subsidiary's borrowings were not under an open line of credit, when that debt was paid back that repayment would not, ipso facto, as argued by Douglas, result in the accordion's expansion. The prospectus stated that a portion of the net proceeds from the sale of the debentures would be used to repay in full the short term bank borrowings incurred under the open line of credit, that is, borrowings in the amount of $30,400,000. The prospectus did not disclose that any of the proceeds would be used to pay the Canadian subsidiary's liabilities of $44,459,322.

Therefore, reasonably prudent investors, after carefully reading the prospectus, would have concluded that only $30,400,000 of the proceeds would have been used to repay loans and the remainder would be available for financing the build-up of inventories. They simply had not been informed that defendant intended to use substantially all of the proceeds to repay bank loans. Had they been so informed, they might have been deterred from purchasing the debentures.[17]

### III. *Failure to Disclose Pre-Tax Loss of $7,517,000*

Plaintiffs have emphasized defendant's failure to explicitly state in the prospectus that there was a pre-tax loss of $7,517,000 for the second quarter of fiscal 1966. Since the prospectus stated that there was a net loss of $3,463,000 recorded for the three months ended May 31, 1966, failure to disclose the pre-tax loss would be material if 1) a reasonably prudent investor could not readily have ascertained the size of the pre-tax loss if he were told the size of the net loss and 2) an investor would be misled if he knew only the size of the net loss.

With regard to the first requirement, the court finds that it would have been difficult for the ordinary investor to figure out the size of the pre-tax loss.[18]

---

17. See p. 355 *supra.*
It should be noted that defendant, in connection with the statement in the prospectus that a portion of the proceeds would be used to repay in full the short-term bank borrowings, asked the court to find that
"[u]nder the section entitled 'Capitalization,' the prospectus stated that as of July 11, 1966 the Company's outstanding short-term bank borrowings, which had ranged during fiscal 1966 from none to $110,800,000 under a $125 million open line of credit, currently stood at $74,859,322 (including $44,459,322 of outstanding bank borrowings incurred by DACAN [the Canadian subsidiary])."

Defendant's Proposed Findings of Fact, ¶ 186.
However, the prospectus in fact disclosed that only $30,400,000 in short-term loans would be repaid. The court cannot understand the requested finding that the $44,459,322 loan was obtained under the open line of credit since the prospectus clearly indicates that only $30,400,000 was owed under the open line of credit.

18. See Tr., Oct. 17, 1973, pp. 1379–80.
The court disagrees that it would have been "fairly evident" to the ordinary, pru-

The court further finds that the average, prudent investor would be interested in the size of the pre-tax loss and, if informed of the large size of that loss, for the single quarter, might have been deterred from purchasing the debentures.

An investor would want to know the size of pre-tax losses because the tax credits which permit pre-tax losses to be reduced a re exhaustible.

While \he court cannot find that reasonable investors would necessarily have concluded that these credits would be exhausted in the foreseeable future, Douglas' prospects were sufficiently uncertain that investors might have concluded that the credits could be depleted in the near future. Such reasonable investors, had they been informed of the extent of the pre-tax loss, might have been deterred from purchasing debentures since they might have concluded that the $7,517,000 pre-tax loss was more ominous than the $3,463,000 net loss, which was disclosed, since the $7,517,000 loss would have resulted in a substantial depletion of the available tax credits.

Moreover, the post-tax loss takes advantage of *prior* tax events which for one reason or another have given the corporation a tax credit. In contrast, pre-tax loss more accurately reflects the *current* financial health of the corporation. An investor is righty concerned with the current profits and losses being sustained by the corporation.

██  Therefore, the court finds that the fact omitted, i. e., the $7,517,000 pre-tax loss, was material since a reasonable bond investor would have considered the fact important in the making of his decision whether to invest. *See Affiliated Ute Citizens, supra,* 406 U.S. at 153–154, 92 S.Ct. 1456.

dent investor that Douglas was in a 50 per cent tax bracket and that investors could,

accordingly, have readily ascertained the pre-tax loss.