Lawrence J. BEECHER et al., Plaintiffs,

· v.

Charles R. ABLE et al., Defendants.

Harry H. LEVY, Plaintiff,

v.

DOUGLAS AIRCRAFT COMPANY, INC.,
et al., Defendants.

Lillian GOTTESMAN, Plaintiff,

v.

A. V. LESLIE et al., Defendants.

Nos. 66 Civ. 3471, 66 Civ. 3382,
66 Civ. 3775.

United States District Court,
S. D. New York.

Findings of Fact and Conclusions of
Law March 17, 1975.

On the Issue of Liability under Rule
10b–5 Sept. 26, 1975.

As Amended Oct. 1, 1975.

On Fee Application July 1, 1977.

As Amended Aug. 16, 1977.

**400**

Pomerantz, Levy, Haudek & Block by Abraham L. Pomerantz, Robert B. Block, A. Arnold Gershon, Roger Haudek, New York City, Lead Trial Counsel for plaintiffs.

Milberg & Weiss by Lawrence Milberg, New York City, for plaintiff Gottesman.

Joseph Calderon, New York City, for plaintiff Levy.

White & Case by Haliburton Fales, II, Rayner M. Hamilton, Sharon E. Grubin, New York City, for defendant Douglas Aircraft Co., Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

### INTRODUCTION

In its Findings of Fact and Conclusions of Law, dated March 20, 1974, the court found that defendant Douglas Aircraft Company, Inc. (Douglas) had on July 12, 1966 sold $75 million of its 4¾ convertible debentures due July 1, 1991 under a materially false prospectus. In particular, the court found that the break-even prediction, use of proceeds section and the failure to disclose certain pre-tax losses rendered the prospectus misleading. The parties have agreed that no damages are properly attributable to the erroneous use of proceeds and pre-tax loss portions of the prospectus. (Tr. Pre-trial Conference of October 17, 1974 at p. 21.) Accordingly, trial of the damages sustained by plaintiffs and members of the class rep-

resented thereby, i. e., all persons who bought the convertible debentures between July 12, 1966 and September 29, 1966, was limited to those damages caused by the misleading break-even prediction in violation of § 11 of the Securities Act of 1933. 15 U.S.C. § 77k.

At the outset the court notes that the measurement for damages caused by violations of § 11, as set forth in the statute, is as follows:

"11(e) . . . The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought: Provided, That if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable."

As might be anticipated from a reading of this section of the statute, the parties are in disagreement regarding the content to be given several significant terms used in § 11(e).

First, there is a dispute as to "the time such suit was brought." Secondly, there is a dispute as to the value of the debentures as of the time of suit. Third, there is sharp disagreement as to the cause or causes of the drop in the value of the debentures after September 26, 1966. Fourth, there is a dispute as to the effect of later market action on certain damage claims.

For the reasons noted below, the court reaches the following conclusions. First, the court concludes that the time when the suit was brought was October 14, 1966, the day on which the first of these consolidated cases was filed. Secondly, the court concludes that the fair value of the debentures on the day of suit was 85, said figure reflecting an accommodation of the market price, panic selling, and intrinsic value of the offering. Third, the court concludes that defendant has failed to carry its burden of proving that damages sustained by plaintiffs were due to factors other than the misleading prospectus. Fourth, the court concludes that under the statute later market action of the debentures is irrelevant in determining the plaintiffs' claims. Finally the court makes certain findings with respect to named plaintiff Lawrence J. Beecher and establishes 6% as the pre-judgment interest rate, and 6% as the post-judgment interest rate.

*TIME OF SUIT*

■ The *Levy, Beecher* and *Gottesman* suits were commenced on October 14, 1966, October 19, 1966, and November 9, 1966 respectively. Plaintiffs' lead counsel has urged that October 19, 1966 be selected as the date on which suit was filed. Insofar as the closing price for the debentures on October 19, 1966 was 73, and insofar as price is some evidence of value, selection of the October 19th date—as opposed to the October 14th date, when the debentures closed higher at 75½—would tend to increase the damage award to the plaintiff class.

Defendant has treated date selection as a relatively unimportant issue, since defendant has consistently urged the court to look to the intrinsic value rather than market price of the debentures when measuring plaintiffs' damages, if any. In sum, to the parties, date selection is only as important as is their reliance on market price.

The court concludes that the most logical date for present purposes is October 14, 1966, the date on which the first, i. e., *Levy*, action was filed. In reaching this conclusion, the court notes that at the time of filing each of the three consolidated cases anticipated congruent classes. On October 14, 1966, when the first suit was filed, all those individuals who would eventually comprise the plaintiff class were already contemplated by the action, even though in subsequent proceedings the *Levy* class was voluntarily limited. Hence, there is no problem of selecting a date and suit which might prove under-inclusive.

During the course of the trial, defendant suggested that the first date be selected, since publicity surrounding the filing of suit may have artificially altered the market price of the debentures during subsequent days and weeks. Thus, defendant claimed, selection of either the second or third date, and its corresponding market price as evidence of value, might prove unreliable. While publicity about a securities case may have the effect claimed by defendant, here there was neither evidence of publicity nor any effect of the filing on the market. The court notes, therefore, that its decision to elect the date of filing of the first suit, as the date of suit is made without reliance on this argument.

In the present cases, the first date seems the most logical benchmark for measuring damages under § 11(e). In future cases the prospect of selection of the filing day of the first suit may well reduce date-shopping subsequent to the first filing and so far as possible limit the multiplicity of identical suits. Further, the certainty of the date of the first suit may shorten future damage trials, since evidence of value can be limited to one particular day.

## VALUE AS OF THE TIME OF SUIT

As noted above, the value of the securities at the time of suit was sharply contested at trial. To establish "value", plaintiff asks the court first to look to the trading price on the day of suit and then to reduce that price by a sum which reflects the un-disclosed financial crisis of defendant. At trial, plaintiff characterized the market for these debentures as free, open and sophisticated marked by a heavy volume of trading on national and over-the-counter exchanges. Plaintiffs relied on trading data from July to mid-October 1966 and the testimony of their expert, Mr. Whitman, in reaching the conclusion that market price was the best evidence of maximum fair value. (Def's Exh. D 820(26); Pl's Exh. 115; Tr. 455–56; 476–77.) The reason plaintiffs urge that market price reflects maximum fair value, as opposed to value, is because the buying public was unaware of the financial crisis gripping defendant in mid-October 1966. Thus, according to plaintiff, had the buying public been aware of the crisis they would have paid less for the security.

The factors precipitated by the falsity of the break-even prospectus forecast which led plaintiff to characterize defendant's financial condition as "critical" include the following:

1) As of October 10, 1966, defendant forecast a post-tax loss of $21.9 million for fiscal 1966. (Pl's Exh. 109, "Consolidated Company Financial Report", p. 3).

2) The time was one of extreme cash tightness. Year-end liabilities were estimated at $512. million as against current assets of $561. million, of which $407. million consisted of inventories. (Pl's Exh. 109, "Consolidated Company Financial Report", pp. 6–7.)

3) During the period following October 10, 1966 the group of eight banks which had previously extended credit to defendant, altered their terms and made certain other demands. Those changes included a suspension of the open line of credit and security for outstanding loans. (Pl's Exh. 12, App. C, p. 9; Tr. 267–68, 270–71). The interest rate on loans to defendant was raised from prime to a point above prime. (Tr. 310) The banks insisted on frequent projections as to defendant's cash needs and such needs were only met on a fully collateralized basis. (Tr. 273, 296–97.) The banks insisted that defendant obtain addi-

tional advances from its airline customers, that defendant discount customer paper with the Export-Import Bank and that defendant apply to the Department of Defense for a Regulation V loan. (Tr. 283–84) Significantly, the banks were demanding an infusion of equity capital ($25. million by February 15, 1967 and an additional $75. million shortly thereafter) (Tr. 277–78, 291, 315–16). Defendant's investment bankers, Merrill Lynch Pierce Fenner & Smith, however, advised against another public offering as a source of such equity. (Tr. 276–77, Pl's Exh. 12, App. C, p. 11)

4) There was serious discussion among the banks to the effect that defendant's management needed strengthening. (Tr. 313–14)

5) No firm proposals for a merger, which would have solved defendant's problems with regard to management and an infusion of equity, had been made by mid-November 1966. (Pl's Exh. 93, pp. 3–4)

Plaintiff further claims that comments contained in various memoranda and reports prepared in support of the merger of defendant and McDonnell Company constitute admissions by defendant that its financial plight was grave. (See Pl's Exh. 12, pp. 5–6, 8; Pl's Exh. 12, App. C, p. 19; Pl's Exh. 99, pp. 3–4)

In sum, plaintiff's claim that the market price of the debentures reflects a sophisticated assessment of the security's value, but that insofar as the financial plight summarized above was undisclosed, market price should be lowered to arrive at fair value. That is, had investors known of the crisis, they would simply have paid less.

The defendant urges the court to adopt a somewhat different approach from plaintiffs' in establishing "value" of the security at time of suit. Defendant contends that the market action of this offering was volatile and often unrelated to fair value. (Tr. 359–61) In particular defendant claims that on the date suit was filed the market price of the debenture was temporarily depressed by panic selling in response to the release of the defendant's disappointing third quarter earnings results. Thus, ac-

cording to defendant, the market price of the debenture on the date of suit was not a reliable indicator of fair value. Defendant would have the court look to the optimistic long-range prospects of the defendant company and set a value which would not only off-set panic selling but which would reflect defendant's anticipated future gains, or the investment feature of the offering. That value, of course, would be in excess of the closing market price on October 14, 1966 of 75½.

In support of the above argument defendant relies on the following evidence.

1) To demonstrate the volatile nature of this offering defendant notes, by way of example, that the debentures were temporarily depressed from August 25, 1966 through mid-September due to the introduction of competitive Boeing debentures. (Def's Exh. 866, Def's Exh. 820(2); Tr. 465–69, 493–97, 505–09).

2) As evidence of panic selling on the date of suit, defendant points to the fact that prior to the announcement of the third quarter results on September 28, 1966 the price of the debentures had consistently been well above 80 to 82½. (Def's Exh. 820(26)). Defendant also notes that the market price had again recovered by November 1966 and remained above 100 throughout calendar 1967. (Def's Exh. 820(2)).

3) As further evidence of panic selling and the peculiar—hence unreliable—market price on the date of suit, defendant notes that although the market price of the debentures had been steadily declining since July 1966 the price of the debentures fell off at an accelerated rate after the announcement of the third quarter results in late September, 1966.

4) Defendant also notes as evidence of panic selling that defendant's common stock dropped in price at a rate in excess of comparable offerings after the third quarter results were announced. In particular defendant relies on the Barron's Aircraft Manufacturers Group stock average, an index with which the actual price of defend-

ant's stock had enjoyed a 92% correlation during 1964, 1965 and 1966. (Def's Exh. 820(9), Def's Exh. 820(33); Tr. 373–74, 380) Based upon the Barron's Aircraft Manufacturers Group stock average, the price of defendant's common stock should have been about 42½ in late September 1966. (Def's Exh. 820(9), Tr. 385) In fact, the defendant's stock closed at 36⅝ on September 30, 1966. (Def's Exh. 820(26)) According to defendant, this difference between the expected and the actual stock price—and the correspondingly low market prices for the debentures—was a temporary aberration attributable to the revelation of the third quarter earnings. (Tr. 385)

5) With respect to the argument that the court should set a value which reflects future recovery, defendant relied on evidence establishing that it had a significant backlog, amounting to $3.3 billion by the end of 1966. (Tr. 58–59) Defendant claims that this backlog would eventually result in profits which according to historical price-earnings ratios would lift the defendant's stock to at least $81. and simultaneously raise the price for debentures well in excess of 80 to 82½. (Def's Exh. 820(1) and (2)) Defendant argued that its production problems with respect to the DC–8 program would be readily resolved, notwithstanding then current increasing costs due to a "reverse learning curve".[1] (Liability Trial, Tr. 988, 990–91)

6) With respect to establishing the creditworthiness of defendant, and to defeat plaintiffs' argument that defendant was beset with a financial crisis, evidence was introduced which showed that the banks continued to extend credit to defendant, albeit on stricter terms. In particular, between July 31, 1966 and November 30, 1966 the American and Canadian Banks extended Douglas $110,783,454 of new bank credit. (Pl's Exh. 55, p. 21, Pl's Exh. 80, p. 18)

7) Similarly, defendant argued that the purchase of 1,500,000 shares of Douglas stock by McDonnell Aircraft Corporation at $45.80 a share on January 26, 1967 was further evidence of defendant's substantial intrinsic value and good future. (Tr. 57) Defendant notes that when the common stock was at approximately $45.80 the corresponding price of the debentures was typically around 82. (E. g., Def's Exh. 866) The ultimate merger of McDonnell and Douglas on April 28, 1967 accompanied by limited changes in management was cited as further evidence of defendant's soundness and hence the high value of its debentures.

As the above arguments indicate both parties for different reasons are dissatisfied with market price as conclusive evidence of value. The court is urged to look to market price and then either add or subtract a certain amount, depending on which party's claims proves more convincing. Plaintiffs through their expert conclude that fair value on the date of suit was 41. (Tr. 480) In contrast, defendant through its expert concludes that the value of the debentures on the date of suit was between 80 and 82½. (Tr. 393) As noted elsewhere, closing market price on date of suit was 75½.

■ Case law, commentators and the parties agree that realistic value may be something other than market price, where the public is either misinformed or uninformed about important factors relating to the defendant-offeror's well being. *E. g., Feit v. Leasco Data Processing Equipment Corp.,* 332 F.Supp. 544, 587 (E.D.N.Y.1971); 3 Loss, *Securities Regulation* 1735 (2d ed. 1961); C. T. McCormick, *Damages,* § 122a, p. 461 fn. 57 (1935); Comment, "Civil Liability For Misstatements in Documents Filed Under Securities Act and Securities Exchange Act", 44 *Yale L.J.* 456, 459–60 (1935); Note, "Legislation: Federal Regulation of Securities: Some Problems of Civil Liability", 48 *Harv.L.Rev.* 107, 114–15 (1934). The court has previously indicated that in its view market price is merely some evidence of value. See Pretrial Order of October 22, 1974 at footnote 1. Moreover, the conclusion that "value" is not synonymous with "market price" seems clearly

---

1. This same argument was advanced with some success in a different connection during the liability trial. See Findings of Fact and Conclusions of Law, dated March 20, 1974 at p. 16.

dictated by the plain language of Section 11(e) in which both "price" (sometimes "amount paid") and "value" are used, apparently deliberately, to connote different concepts.

After considering the above evidence offered by the parties with respect to "value" at the time of suit, the court makes the following observations and findings and reaches the following conclusions. Although the plaintiffs produced considerable evidence tending to show the unfavorable financial situation of defendant at the time of suit, the evidence does not convince the court that the situation was as desperate or life-threatening as it has been characterized by plaintiffs. More importantly, the court does not agree with plaintiffs that had investors known of the defendant's financial situation they would invariably have paid less for the debentures and that the court should set a value considerably below market price.

As the parties seem to agree, the market for these debentures was, in the main, a sophisticated market. As such, it no doubt was most interested in the long range investment and speculative features of this particular offering. (E. g., Tr. 349–51) The defendant's immediate financial troubles would likely be viewed as temporary rather than terminal by such a market. Certainly the existence of the warrant feature suggests a buying public which was future-oriented.

As defendant urged, notwithstanding the then current financial difficulties, the future of Douglas was hopeful. In particular, the substantial backlog of unfilled orders as well as the banks' continued extension of credit suggested a reasonable basis for belief in recovery. The court relies heavily on these factors in reaching the conclusion that at the time of suit the fair value of the debentures should reflect the reasonably anticipated future recovery of defendant.

Defendant also urged the court to rely on the merger between McDonnell and Douglas as evidencing the attractiveness and hence high value of defendant's offering. Since the merger prospects between McDonnell and Douglas were still equivocal at the time of suit, (Tr. 82), and in any event the ultimate merger was probably more a reflection of McDonnell's unique needs than Douglas' intrinsic value, the court does not rely on the merger or the price McDonnell was willing to pay in reaching the conclusion that defendant had a sound future at the time of suit.

Defendant also argued that the value of the debentures at the time of suit was higher than market price because on that date the market price was artificially lowered due to panic selling in response to the revelation of the third quarter earnings. The evidence strongly supports the conclusion that the market price on the day of suit was characterized by panic selling. The court relies heavily on the trading data in reaching this conclusion. (Def's Exh. 820(26), Pl's Exh. 115) In particular, these data show that following the announcement of the third quarter results the market price dropped off and continued to decline at a rate in excess of the pre-revelation rate. The sharp and continued increase in volume between revelation and mid-October suggests a market reacting to news, here presumably news of the third quarter earnings. In addition to these trading data, there was convincing expert testimony which tends to confirm the conclusion that panic selling was affecting the market price at the time of suit.

Although defendant introduced evidence of various indices to demonstrate the variance between the expected and actual behavior of the debentures, and hence the unreliability of the panic-ridden market price on date of suit, the court does not find it necessary to rely on these projections in reaching the conclusion that panic selling did in fact exist.

The court notes that, notwithstanding the fact that the market for these debentures was normally sophisticated, elements of the buying public were apparently given to irrational investment behavior and the prices during the several weeks following the revelation were substantially affected by that behavior. In the court's view, there is

nothing inherently contradictory in concluding both that the market for these debentures was normally intelligent and paid a price which fairly reflects value, and that the market was occasionally irrational and paid a price below fair value.

■ Based on the foregoing factual findings the court concludes that market price is some evidence of fair value.[2] Using the market price as a starting point, the court further concludes that whatever amount might rightly be subtracted to account for the temporary financial crisis of defendant at time of suit, should be off-set by adding a like amount to account for the reasonable likelihood of defendant's recovery. That is, in the court's view, with respect to value at the time of suit the defendant's financial difficulties were balanced off by the defendant's probable recovery.

Finally, the court concludes that there was convincing evidence that the market price of the debentures on the day of suit was influenced by panic selling. Hence the price was somewhat below where it might have been, even in a falling market. To correct for this aberration, the court adds 9½ points to the market price of 75½ to establish a figure of 85 as fair value on the date of suit. It is expected that the figure of 85 as value represents a fair value of these debentures unaffected by the panic selling which along with other factors depressed the market price from 88 on September 26, 1966 to 75½ on October 14, 1966.

In reaching this figure the court notes that the market fell 12 points between July 12 and September 26, 1966 at an average rate of .22 per day for 54 trading days. Had that rate continued for the 14 trading days September 27 to October 14, 1966 the price of the debentures would have been at approximately 84.92. Thus, 85 seems a fair value as of October 14, 1966. The 85 figure may well have obtained in a falling market, unaffected by panic selling.[3]

## DEPRECIATION RESULTING FROM CAUSES UNRELATED TO THE FALSITY OF THE PROSPECTUS

Under the proviso in Section 11(e) the defendant has the opportunity and burden of proving that any portion or all of the damages claimed by plaintiffs represent damage other than the depreciation in value of such security resulting from that part of the registration statement with respect to which liability is asserted. At trial defendant introduced considerable evidence which was intended to demonstrate that unexpected and unforeseeable events adversely affected the Douglas debentures subsequent to the issuance of the prospectus. It was claimed that these various events largely caused the drop in the debentures and that damages otherwise arrived at should be adjusted by a factor of somewhere between 3 and 12. (See e. g., Defendants' Proposed Finding # 347.)

More particularly, defendant identified the following developments among others as unexpected adverse factors.

1) Pratt & Whitney, Douglas' engine supplier, reduced its previous commitment for DC-9 and DC-8 engine deliveries on September 29, 1966, thereby causing defendant production delays. (E. g., Defendant's Exh. 800, Def's Exh. 865, pp. 64, 72.)

2) Bank credit was tightened in response to a Federal Reserve Bank letter of September 1, 1966 just at a time when defendant was requesting an expansion of its credit line. (Tr. 265–68.)

3) Various military demands, e. g., for A–4 fighters and bomb racks, unexpectedly increased. (Liability trial, Tr. 1873–1877) These demands affected Douglas' subcontractors who in turn sought financial assistance from defendant.

4) Priorities for commercial aircraft were restricted in response to a directive of the Executive Office of the President on July 22, 1966. As a result, Pratt & Whitney

---

2. See Pre-trial Order of October 22, 1974, at fn. 1.

3. In setting a value the court has disregarded any consideration of accrued interest, since as a practical matter interest will be realized at the time of sale.

diverted production from commercial to military equipment and fell further behind in deliveries to defendant. (E. g., Def's Exh. 800, p. 3; Pl's Exh. 111)

5) Finally, defendant urged that the general economy declined in late 1966. In support of this proposition, defendant noted among other things that the supply of money contracted, that the federal budget incurred an unanticipated deficit, that the availability of bank loans declined, and that industrial production as measured by the Federal Reserve Board's Index of Industrial Production declined. In sum, according to defendant, the "mini-recession" came in. (E. g., Def's Exh. 843)

In response, plaintiffs argue that the drop in the market price and value of the debentures after September 26, 1966 was caused by the revelation of the third quarter operating loss and that the losses themselves were foreseeable. Furthermore, plaintiffs remind the court, it was the likelihood of events which might cause losses and the defendant's failure to account for this which rendered the prospectus misleading. Plaintiff claims that while the quantity of events may have changed, their nature and quality were foreseeable. Thus, when the third quarter losses were revealed and accordingly the falsity of the prospectus forecast made apparent, there was a sharp decline in the market price for the debentures. That decline according to plaintiffs is causally related to the falsity of the prospectus and is not attributable to any allegedly unexpected events.

■ Plaintiffs concede that defendant has established that the decline in market price from 100 to 88 from July 12 to September 26, 1966 (the last trading date before there was some revelation of the losses during the third quarter) resulted from increased interest rates and other general economic phenomena which were unrelated to the falsity of the prospectus forecast or other material falsities in or omissions from the prospectus. It follows therefore that no one who sold before September 27, 1966 has a claim. That is because any loss that was sustained in a pre-September 27th sale was due to a drop in market price unrelated to any falsity in the prospectus. Thus, the pre-September 27th drop caused by general market phenomena cannot be charged against the defendant, regardless of defendant's wrong doing. As noted above, however, the cause of the decline in the market price for the debentures after the revelation is in controversy.

As a preliminary matter, there appears to be some disagreement as to precisely when the third quarter losses became known to the trading public. The court concludes that the evidence establishes that the falsity of the prospectus forecast was revealed when rumors that Douglas was about to announce a large operating loss for the third quarter circulated widely on September 27, 1966. (Tr. 430–35, Pl's Exh. 111) The court selects September 27th, notwithstanding the fact that on September 28, 1966 Douglas more formally announced a pre-tax loss of $32,796,000. and a post-tax loss of $17,061,000. for the third quarter fiscal period. (Pl's Exh. 37, pp. 9–10; Pl's Exh. 44)

■ With respect to the causes of depreciation after the revelation the court concludes that defendant has failed to carry its burden of proving that the depreciation was caused by factors unrelated to the falsity of the prospectus. In reaching this conclusion the court agrees with plaintiffs' analysis that the depreciation was immediately occasioned by the revelation of third quarter losses, and that the losses themselves were largely foreseeable, or at least not unexpected. In sum, investors were influenced to buy the debentures in reliance on misleading forecasts assuming recovery. When the misleading nature of the prospectus was exposed by the announcement of third quarter losses the price of the debentures dropped and the purchasers who had bought in reliance on the prospectus suffered losses. These losses were clearly related to the falsity of the prospectus.

Defendant referred to many events, summarized above at pp. 406–407 which were characterized as unexpected or wholly unforeseeable. In the alternative, defend-

ant argued that even if the events were foreseeable or should have been foreseen their quantity was such that the magnitude of their impact was not foreseeable. The court does not agree.

In its Findings of Fact and Conclusions of Law on Liability the court noted that "[c]onditions in the aerospace industry were gravely unsettled during fiscal 1966 rendering income forecasting uncertain. The Vietnam War had resulted in acute shortages of manpower and essential parts. . . . Because future availability of manpower and parts would depend largely on the progress of the War, a matter about which predictions were plainly risky, earnings forecasts for fiscal 1966 would likewise be uncertain." (Findings on Liability at 21) As this quotation demonstrates, the court has already concluded that the conduct of the Vietnam War and the attendant military demands on the aerospace industry were subject to wide fluctuation during 1966. Defendant's present claim that it was surprised by the changing military demands and protection priorities is inconsistent with the facts as previously found by the court.

Elsewhere in its Findings on Liability, the court noted that Pratt & Whitney ". . . had failed repeatedly and for several months prior to the effective date of the prospectus to meet its firmest commitments." (Findings on Liability at 21) Furthermore, ". . . there was a fair possibility that some of the conditions which were beyond Douglas' control, such as failure of its engine supplier [Pratt & Whitney] to meet its commitments, might continue to deteriorate. . . ." (Findings on Liability at 31) Again, defendant's present claim of surprise at the deteriorating Pratt & Whitney delivery situation is defeated by the court's previous Findings.

Finally the court rejects defendant's claim that depreciation resulted from unforeseen developments in the market generally and in the market for money specifically. While credit arrangements may have become more difficult to make, testimony by defendant's own witnesses establishes that at no time between July 12, 1966 and May 1967 was Douglas unable to arrange financing in order to meet its obligations in the ordinary course of business. (Tr. 293–94) Furthermore, the stability of yields for other corporate bonds rated Baa by Moody's (Def's Exh. 820(19), Tr. 359–60, 465–67), and the essentially flat price action of the highly comparable Boeing Co. convertible debentures due 1991 (Pl's Exh. 114, Tr. 458–59, 465–69) and of 18 other roughly comparable convertible debentures (Def's Exh. 820(19), Pl's Exh. 112, Tr. 465–66, 471–74, 480–81, 484–85, 510–11, 356–57, 395–96), between September 26 and October 14, 1966, belie defendant's claim that industry and the bond market in general were suffering in late 1966. Instead, a comparison of the falling price of defendant's debentures and the stable market action of other Baa corporate bonds, the Boeing convertible debenture and the 18 other convertible debentures confirms the conclusion that the decline in market price for the Douglas debentures after September 26, 1966 was caused by the revelation and was related to the falsity of the prospectus, rather than by market conditions generally.

In reaching the above conclusion the court emphasizes that unlike some commentators, the court does not believe that defendant's burden of proof of "negative causation" is "impossible." Compare, R. Jennings & H. Marsh, *Securities Regulation, Cases and Materials,* 810 (1968). Indeed, the court is aware that defendants have benefitted from clearly falling markets in other similar cases. *E. g., Feit v. Leasco Data Processing Equipment Co.,* 332 F.Supp. at 586 and *Fox v. Glickman Corp.,* 253 F.Supp. 1005, 1010 (S.D.N.Y.1966). Here, the court's conclusions are based on an assessment of all the evidence. In the court's view, the weight of the evidence clearly establishes that the depreciation in the Douglas debentures was due to causes directly related to the falsity of the prospectus rather than the unrelated factors urged by defendant.

In contrasting the market action of the Douglas debentures and other groupings of

bonds the court is very much aware of the possibility of relying on an inappropriate comparison. Nevertheless, the court finds each of the proffered comparisons, i. e., those bonds rated Baa, the Boeing offering, and the 18 convertible debentures, of some relevance. The Baa group demonstrates the stability of yields of bonds of the same general quality. The action of the Boeing offering provides a relevant comparison of a roughly comparable offering, presumably unaffected by news the magnitude of Douglas' third quarter report. Finally, the action of the 18 convertible debentures which were selling close to investment value and at premiums of 10% or more over conversion parity demonstrates the behavior of offerings which share, along with Douglas, the risk-taking aspect peculiar to convertible debentures. Although no one of the comparisons taken alone would have convinced the court that the price of the Douglas offering was varying in an unusual manner, the essentially flat prices of *all* three of the other indicators taken together had a synergistic impact on the court's assessment of the weight of that evidence. It appears that Douglas alone declined so dramatically over the period in question. The court attributes the depreciation to factors related to the falsity of the prospectus but unrelated to alleged market decline generally.

EFFECT OF LATER MARKET ACTION ON DAMAGE CLAIMS OF PLAINTIFFS WHO EITHER SOLD AFTER 1967 OR RETAIN THEIR DEBENTURES

Defendant has brought to the court's attention the fact that the debentures regained their issue price of 100. on February 1, 1967, thereafter peaked at 145. and remained above 100. for the remainder of 1967. According to defendant, the claims of plaintiff Beecher and others who sold at a loss in or after 1967, and the claims of those plaintiffs who still retain their debentures should be disallowed because 1) the deleterious effects of the false prospectus were presumably spent when the debentures reached par by February 1967, 2) those plaintiffs could have and should have mitigated their damages by selling, and 3) the "negative causation" proviso of § 11(e) requires this result. The court does not agree.[4]

As the court understands the statute, with the exception of § 11(e)(3), post-suit market action is irrelevant in establishing plaintiffs' damages. Section 11's damage formulae are explicit, comprehensive and hence, exclusive. Clause (1) covers those who never sold; clause (2) covers those who sold before suit; and clause (3) covers those who sold after suit. With respect to post-suit sellers, the impact of post-suit market action has been fully accommodated under clause (3) in which the recovery of post-suit sellers is limited to actual or realized loss.

Clause (3) provides for damages which are the difference between the amount paid (not exceeding par) and "the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding [par] . . .) and the value thereof as of the time such suit was brought." With respect to those who never sold, clause (1) clearly limits the relevant considerations to the time of suit. Clause (1) provides for damages which are the difference between the amount paid (not exceeding par) and "the value thereof as of the time such suit was brought."

These statutory formulae were devised for the unique situations presented by the instant cases. The usual tort out-of-pocket measure (price paid less value at the

4. In its opinion of March 10, 1969 entitled "Decision on Motions to Declare These Actions Class Actions" the court at pages 14–15 made certain passing observations with respect to the possible effect of a rising market on damages. After briefing and a trial on the merits, the court believes that its preliminary observations were incorrect, and accordingly renders the present opinion on this issue.

*time of purchase* ) was apparently rejected by the legislature.[5] In preference, § 11(e) provides that price paid less value at *the time of suit* be awarded where a plaintiff retains the security and that the lesser of price paid minus suit value or realized loss be awarded where plaintiff made a post-suit sale. See III L.Loss, *Securities Regulations,* pp. 1629 and 1728 (2d Ed. 1961). Price paid less the time of suit value is the statutory benchmark. Further, defendant benefits from post-suit sales in a rising market but is unaffected by post-suit sales in a falling market. Beyond this, however, defendant cannot stretch its advantage to bar claims because of post-suit market increases.

The court agrees with Judge Weinfeld's reasoning made in a similar context in which the fortuitous events of the market could not be invoked to immunize the defendant's wrongdoing. *Voege v. Ackerman,* 364 F.Supp. 72, 73 (S.D.N.Y.1973). The time of suit value is the statutory cut-off. In general, damages are frozen as of that date. The defendant cannot be charged with declines unrelated to the falsity of the prospectus. Neither can the defendant benefit from a rising market, except to the limited extent provided for in § 11(e)(3). The court finds no authority in case law or logic for demanding that victimized purchasers mitigate damages by making investment decisions subsequent to filing suit. Given the statutory damage formulae defendant will benefit from a post-suit sale in a rising market, should a purchaser choose to sell. Although the statute confers this benefit, a purchaser is not required to sell merely to reduce defendant's damages.

## DEBENTURE TRANSACTIONS AND DAMAGES OF A NAMED PLAINTIFF

█ The court makes the following findings with respect to damages sustained by the named plaintiff Lawrence J. Beecher.

Plaintiff Beecher bought $5,000. in principal amount of the debentures on July 12, 1966. In two separate transactions on November 13, 1970 plaintiff Beecher sold 3,000 of the principal amount at 58¼ for a sum of $1,787.49, less a commission of $15.00 and registration fee of $.03, and 2,000 of the principal amount at 58¾ for a sum of $1,201.68, less a commission of $10.00. The gross proceeds total $2,922.50, but the realized net sale proceeds total $2,897.47 (Pl's Exh. 83). Insofar as plaintiff Beecher sold after suit but before judgment, his claims are to be measured by § 11(e)(3). Since the price which plaintiff Beecher received upon sale was less than value as determined by the court, plaintiff Beecher is entitled to the difference between amount paid and value, minus 12 points which plaintiff concedes the market had dropped between July 12 and September 26, 1966 (supra. p. 25), i.e., $5,000. minus $4,250. or $750 minus $600. Thus, Mr. Beecher is entitled to damages of $150.00.

The court further finds that plaintiff Beecher's claim is typical of those of the other named plaintiffs and of the class generally, and that the damages of the remaining plaintiffs, whether they sold before suit (but after September 27, 1966), after suit or still retain the debentures, can be calculated in a similar manner. To expedite the determination of damages, the court will appoint a Special Master who will ascertain the damages suffered by the other named plaintiffs and the class generally in accordance with the findings and conclusions reached in this opinion.

█ With respect to interest, the court in its discretion concludes that plaintiffs shall be entitled to recover interest on their damages from the date of suit unless the debentures were sold before suit, in which case interest shall run from the date of sale. *Austrian v. Williams,* 103 F.Supp. 64, 117–19 (S.D.N.Y.), *reversed on other grounds,* 198 F.2d 697 (2d Cir.), *cert. denied,* 344 U.S. 909, 73 S.Ct. 328, 97 L.Ed. 701 (1952). In

---

5. Section 11(e) as amended 1934 has been described as "modified 'tort damages'." 3 Loss, *Securities Regulation* 1728 (2d ed. 1961).

the court's view such an award is compensation for the damage caused by the wrong done, as found in the liability trial, and is consistent with fundamental considerations of fairness. *Norte & Co. v. Huffiness,* 416 F.2d 1189, 1191 (2d Cir. 1969), *cert. denied,* 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970).

In reaching a rate at which interest shall be awarded, the court notes that the prime rates charged by banks have ranged from approximately 6% in late 1966 to 11¼% in November 1974, with a low of approximately 4¾% in early 1972. The court also notes that it was not until relatively recently, i. e., mid-1973, that the rates consistently remained above 8%. Further, the court notes that the debentures themselves bore a rate of 4¾% due in 1991 which is some indication of the expectations of the plaintiff class with respect to a reasonable rate of return. In light of the foregoing, the court concludes that a rate of 6% as prejudgment interest is equitable. This figure represents an accommodation of prevailing rates, plaintiffs' expectations, and an assessment of the severity of the loss for which plaintiffs are to be compensated.

With respect to post-judgment interest, the parties are in apparent agreement that the court is to look to the prevailing rate in the forum. 28 U.S.C. § 1961. Accordingly, the court finds 6% as authorized in C.P.L.R. § 5003 to be the appropriate rate.

The trial with respect to liability, if any, under Rule 10b–5 will commence August 5, 1975.

Submit order on five days notice.

1. Following the issuance of this court's decision on that matter on March 17, 1975, the parties were directed to appear for trial on August 5, 1975, concerning the liability, if any, of defendants under § 10(b) of the Securities Exchange Act of 1934. All parties subsequently agreed that for the purpose of determining this issue, they would rely upon the record made during the previous proceedings before this court.

The stipulation between the parties to the effect that no damages are properly attributable to the material misstatements concerning the

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON THE ISSUE OF LIABILITY UNDER RULE 10b–5.**

These actions, consolidated for trial, are brought on behalf of certain purchasers of a $75 million issue of 4¾% convertible subordinated debentures, sold pursuant to an alleged materially false registration statement filed with the Securities and Exchange Commission. The court previously directed that plaintiffs' claims be bifurcated. In the first phase of trial, which resulted in this court's decision dated October 24, 1974, it was determined that defendants had made material misstatements in the challenged prospectus. The next phase of the litigation dealt with plaintiffs' damages sustained as a result of the misleading break-even prediction in violation of § 11 of the Securities Act of 1933.[1]

1. *Plaintiffs' right to recover under § 10(b) of the 1934 Act.*

Defendants first argue that plaintiffs are not entitled to bring an action under § 10(b) of the Security and Exchange Act of 1934, when they are already provided with a full right of recovery under § 11 of the Securities Act of 1933. In support of their argument, defendants reason that a private right of action under § 10(b) was judicially created because there was no other available statutory right of recovery for actions prohibited under § 10(b); that in this case a statutory right of recovery is available under § 11; and that plaintiffs should not be permitted to nullify in effect the provisions of § 11 by seeking recovery under the procedurally less stringent requirements of § 10(b) when there is an adequate remedy under § 11. Defendants also suggest that

use of proceeds and pre-tax loss portions of the prospectus (Tr. Pre-trial Conference of October 17, 1974, p. 21) has no effect here. These two falsities were not revealed by October 14, 1966, the date of commencement of these suits. Consequently, they did not figure in the computation of damages under § 11's loss causation formula. The stipulation concerning damages was limited to the § 11 claims, and has no impact upon the claims made under § 10(b) of the Exchange Act, which utilizes a different formula for measuring damages.

**412**

certain dictum by the Supreme Court, in a footnote in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), indicates that the Supreme Court disapproves of a right of recovery such as that sought by plaintiff in this case.[2] The court rejects defendants' arguments.

 The court does not agree that to permit plaintiffs to recover under § 10(b) would nullify the more stringent provisions set forth for recovery under § 11. Those two statutes, although each applicable to the actions by defendants which are complained of here, provide for two entirely different causes of action. Section 11 of the Securities Act of 1933 is in the nature of a negligent misrepresentation statute. It provides for recovery only in cases involving material misrepresentations in registration statements or prospectuses. The statute of limitations on such actions is set at one year after the misrepresentation should have been discovered, and no more than three years after the offer of the security to the public. Section 13 of the 1933 Act, 15 U.S.C. § 77m. The measure of damages under § 11 is determined by the difference between the price paid for the security and the value of stock at the time of suit, or the price of the stock at the time it is disposed of. Section 11(e), Securities Act of 1933.

 In contrast, § 10(b) provides a cause of action for *fraudulent* misrepresentation; it is not limited to misrepresentations in registration statements and prospectuses, but covers other forms of fraudulent misrepresentations as well. The statute of limitations under § 10(b) is that of the state in which the action occurred. III Loss, Securities Regulation, pp. 1771–72. Finally, the measure of damages under § 10(b) is determined by the out-of-pocket rule, which looks to the value received at the time of purchase. *Levine v. Seilon, Inc.,* 439 F.2d 328, 334 (2d Cir. 1971).

 These significant differences between Section 11 and Section 10(b) indicate that they are different causes of action, directed at remedying different types of wrongdoings. A private right of action under 10(b) was created in order to provide a right of recovery for fraudulent misrepresentations in connection with the purchase or sale of securities. Regardless of whether or not § 11 provides a remedy for other types of misrepresentation, § 10(b) still provides the only right of recovery for fraud. Simply because plaintiffs happen to allege wrongdoing by defendants which entitles them to recovery under both causes of action, this does not indicate that the more stringent requirements of § 11 are being nullified. Those requirements still apply to all of those misrepresentation suits which do not involve allegations of fraud, and will continue to apply to this case if plaintiffs are unable to sustain their burden of proving fraud. Where fraud is alleged, however, plaintiffs are entitled to bring suit under § 10(b) as well. Although plaintiffs need not under § 10(b) meet various stringent requirements under § 11, they must sustain a significantly greater burden of proof. *Wolfson v. Solomon,* 54 F.R.D. 584 (S.D.N.Y.1972); *Rosen v. Bergman,* 40 F.R.D. 19 (S.D.N.Y.1966); *Stewart v. Bennett,* 359 F.Supp. 878 (D.Mass., 1973); *see Fischman v. Raytheon Mfg. Co.,* 188 F.2d 783 (2d Cir. 1951).

 With regard to defendants' suggestion that plaintiffs already have a recovery under § 11 and should not now be entitled to seek another recovery under § 10(b), the court notes that this case does not present any possibility of a double recovery by

2. The Supreme Court, per Mr. Justice Rehnquist, said:
 "Blue Chip did not here present the question of whether an implied action under § 10(b) of the 1934 Act and Rule 10b–5 will lie for actions made a violation of the 1933 Act and the subject of express civil remedies under the 1933 Act. We therefore have no occasion to pass on

this issue." *Blue Chip Stamps v. Manor Drug Stores, supra,* at 752, n. 15, 95 S.Ct. at 1933. Defendants' characterization of this footnote as indicating disapproval of a right to recovery such as that sought by plaintiff in this case is somewhat overstated. The Supreme Court has expressed no opinion on the issue at this time.

plaintiffs. No judgment has been entered on plaintiffs' § 11 claims, nor will any judgment be entered until all of plaintiffs' claims under §· 11 and § 10(b) have been heard. This procedure is consistent with the arrangements made in conference on October 22, 1974. At that conference, it was agreed that the court should determine the plaintiffs' § 11 claims first, with all of plaintiffs' 10(b) rights reserved for determination following the resolution of the § 11 claims. Having agreed to such a procedure, defendants cannot now argue that plaintiffs have lost their rights of recovery under § 10(b) simply by having proceeded to trial first under § 11.

### 2. The fraudulent nature of defendants' misrepresentations.

The court has already determined under § 11 of the 1933 Act that defendants made material misrepresentations of fact with respect to three statements: (a) its prediction that Douglas would break even in fiscal year 1966; (b) its representation of the use to which the proceeds from the sale of debentures would be put; and (c) its failure to disclose its pre-tax loss of $7,517,000. (Findings of Fact and Conclusions of Law dated March 20, 1974, D.C.N.Y., 374 F.Supp. 341.)

 The test of materiality under § 10(b) is identical with that under § 11. See Affiliated Ute Citizens v. United States, 406 U.S. 128, 153–154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); see Escott v. Barchris Construction Corp., 283 F.Supp. 643 (S.D.N.Y.1968). Because the issues of the falsity and materiality of these representations already have been determined, for the purposes of determining liability under § 10(b) the court need only address those additional elements necessary to prove a violation of § 10(b) which were not necessary to the court's finding of liability of defendants under § 11.

 In order for plaintiffs to recover under § 10(b) of the 1934 Act, they must be able to show that the misrepresentations complained of were fraudulent. In determining whether or not the misrepresenta-

tions were fraudulent, this court is not limited to examining defendants' intent. Knowledge of falsity, or reckless disregard for the truth may be sufficient. Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 363 (2d Cir. 1973), cert. denied, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). Mere negligent conduct is not sufficient to permit plaintiffs to recover here. Chris-Craft Industries, Inc. v. Piper Aircraft Corp., supra; SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1096 n. 15 (2d Cir. 1972).

### A. The Break-Even Forecast.

 At the trial on liability under § 11, the motivation behind the issuance of the break-even prediction was explored. That prediction as set forth in the July 12, 1966 prospectus was virtually the same as the one contained in a prior press release issued by Douglas Aircraft on June 24, 1966. (Pl's Exh. 16). The press release was issued following a period of rapid trading of Douglas' stock which indicated to Douglas and to Merrill Lynch, the prospective underwriter of the debentures, that certain persons had obtained and were acting upon inside information concerning Douglas' unfavorable earnings reports. In order to provide this unfavorable earnings information to the general public, Douglas decided to issue its press release predicting that the company would break even in fiscal year 1966. (Tr. 822–29). The court finds that the issuance of the prospectus containing the same prediction was motivated by the same intent as the issuance of the press release: to inform the public about the unfavorable earnings report, in order to neutralize the benefit of inside information obtained by certain holders of Douglas' stock. The issuance of the break-even forecast therefore was not motivated by an intent to mislead purchasers of the debentures concerning Douglas' financial prospects for the rest of the year.

The court also finds that defendants did not actually have knowledge that the break-even forecast materially misrepresented Douglas' financial situation. Defendants had some basis for their break-even

forecast. (Findings, 347 F.Supp. at 348–49.) They simply failed to disclose the assumptions upon which that prediction was based.

The court concluded only that a reasonably prudent investor would not have concluded, given the assumptions, that it was highly probable that the forecast would be satisfied. Plaintiffs have not shown that defendant knew that the break-even prediction was false.

■ Even though defendants did not intentionally or knowingly misrepresent Douglas' financial prospects, they would be liable under § 10(b) if they acted in reckless disregard of whether the statements were true and with a conscious purpose to avoid learning the truth. *United States v. Abrams*, 427 F.2d 86 (2d Cir.), *cert. denied*, 400 U.S. 882, 91 S.Ct. 64, 27 L.Ed.2d 63 (1971); *United States v. Sarantos*, 455 F.2d 877 (2d Cir. 1972). The court concludes that under the circumstances of this case, defendants' actions were neither reckless nor undertaken with a conscious purpose to avoid learning the truth.

Reckless conduct has been defined in general tort law as

". . . an act of an unreasonable character in disregard of a risk known to [the actor] or so obvious that [the actor] must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. . . . [It] tends to take on the aspect of highly unreasonable conduct, or an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. PROSSER, LAW OF TORTS, 185–86 (4th ed. 1971) (footnotes omitted).

In the context of actions alleged to be in violation of § 10(b), a reckless misrepresentation can be defined as a highly unreasonable misrepresentation, involving not merely simple negligence, but an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the actor or is so obvious that the actor must have been aware of it.

In its findings of March 20, 1974, the court reviewed the evidence presented concerning the justification and lack of justification for defendant's prediction that it would break even in fiscal year 1966. The court found that the defendant "had some basis for concluding that it would not have substantial losses for fiscal 1966," and reviewed nine factors giving support to defendants' conclusions. (Findings, 374 F.Supp. at 348–49.) The court went on to find, however, that a "reasonably prudent bond purchaser would not have concluded, from the facts available to Douglas' management at the time the prospectus was issued, that it was highly probable that the forecast would be satisfied in that substantial losses would be avoided in fiscal 1966 . . . ." Findings, 374 F.Supp. at 349–50.)

The evidence presented does not permit, and the court's prior findings preclude, a finding here that defendants' conduct constituted reckless misrepresentation and stemmed from a conscious purpose to avoid learning the truth. Although the prediction was unreasonable, in that a reasonably prudent investor would not have concluded that it was highly probable that the forecast would be satisfied, the existence of *some* basis in fact for making that prediction indicates that defendant's conduct was not so highly unreasonable as to constitute recklessness or fraud. Plaintiffs have failed to sustain their burden of proof with regard to the fraudulent nature of defendants' representations concerning the likelihood that Douglas would break even in 1966.

### B. The Use of Proceeds

In its earlier findings, this court held that defendants' representations concerning the use to which the proceeds from the sale of debentures would be put were material misrepresentations. 374 F.Supp. at 355–56. The court also found that "defendant, at the time the prospectus was issued, intended to use substantially all of the proceeds to pay back short-term bank borrowing." 374 F.Supp. at 355.

■ The court's finding that defendant intended to use the proceeds of the debenture sales to pay back bank borrowings, despite its contemporaneous representations in the prospectus that the proceeds would be used to finance the build-up of inventories, indicates that defendants' misrepresentations were deliberate and intentional, and constituted a fraud upon the purchasers of the debentures.

### C. The Failure to Disclose Pre-Tax Loss

Douglas failed to disclose that it had incurred a pre-tax loss of $7,517,000 for the second quarter of fiscal year 1966. That fact was material, since a reasonably prudent bond investor would have considered the fact important in the making of his decision whether to invest. (374 F.Supp. at 357.)

■ Defendants clearly were aware or should have been aware of the size of Douglas' pre-tax loss for the second quarter. They knew or should have known that this fact would have been highly significant to investors; it reflected the current financial health of the corporation, and would have indicated that Douglas has substantially depleted its available tax credits. (374 F.Supp. at 357.) In view of the importance of the information concerning the pre-tax loss, the court finds that Douglas' failure to disclose the pre-tax loss was either deliberate or so highly unreasonable as to constitute reckless conduct. Furthermore, because it would have been difficult for the ordinary prudent investor to have figured out the size of the pre-tax loss, 374 F.Supp. at 356 and n. 18, the omission of that fact presented a significant and obvious danger of misleading purchasers of the debentures.

### 3. Plaintiffs' Reliance Upon Defendants' Representations.

■ The court already has found that the representations complained of by plaintiffs were material. 374 F.Supp. at 354, 356, 357. Proof of actual reliance upon these representations by the numerous plaintiffs would be impracticable. The court presumes that because defendants' representations were material, plaintiffs would not have purchased the debentures at the rate at which they were offered if they had known the truth. *Affiliated Ute Citizens v. United States, supra*, 406 at 153–54, 92 S.Ct. 1456; *Herbst v. Int. Tel. & Tel. Corp.*, 495 F.2d 1308, 1316 (2d Cir. 1974); *Tucker v. Arthur Anderson & Co.*, 67 F.R.D. 468 (S.D.N.Y.1975); *see Chris-Craft Industries, Inc. v. Piper Aircraft Corp., supra*, at 374; *see Mills v. Electric Auto-Light Co.*, 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

### 4. Conclusion

For the reasons discussed above, defendants are liable to plaintiffs under § 10(b) of the 1934 Act for their misrepresentations concerning the use of the proceeds from the sale of debentures and concerning the pre-tax loss. Trial with respect to the measurement of plaintiffs' damages under § 10(b) will commence on December 3, 1975.

Submit order on five days notice.

## ON FEE APPLICATION

These actions are now before the court on a joint application made by all attorneys representing plaintiffs and their accountants for fees totaling one million five hundred thousand dollars ($1,500,000) out of a settlement fund of five million dollars ($5,000,000).[1] The request also seeks disbursements in the amount of $71,798.05. The settlement fund of $5,000,000 was established in November, 1976 and since that time has been drawing interest which now amounts to approximately $290,000.

---

1. The firms and accountants representing plaintiffs are the following:

 1) POMERANTZ LEVY HAUDEK & BLOCK
 Attorneys for *Beecher* and *Herbst* plaintiffs
 2) MILBERG & WEISS
 Attorneys for *Gottesman* plaintiffs

 3) LINDEN & DEUTSCH
 Attorneys for *Levy* plaintiffs
 4) WEINSTEIN & LEVINSON
 Attorneys for *Kobre* plaintiffs
 5) DAVID BERDON & CO.
 Accountants for class plaintiffs

The joint fee application is supported by a detailed affidavit from each of the four law firms representing plaintiffs and their accountants setting forth the following: 1) particulars of the services rendered; 2) the hours expended by partners and associates; 3) the usual hourly rates for partners and associates in non-contingent complex cases; and 4) a separate schedule of disbursements for each firm and for the accountants.

The joint application is supported by a memorandum of law setting forth the various factors to be weighed by the court in arriving at a fee determination and supporting the amount requested by specific reference to fees awarded by the courts in similar litigation.

A supplemental affidavit has been filed by lead counsel for the plaintiffs detailing additional services rendered and disbursements made since the filing of the original fee application in October 1976. The amount requested additionally is $73,500.00 for legal services and $302.33 for disbursements.

The fee of $1,500,000 originally requested was set forth in the Notice of Class Action Settlement, which went to members of the three classes involved, advising them of the terms of the settlement and the amount of the requested fee. The court finds, after a hearing on the proposed plan and a separate hearing on the proposed fee that there have been no objections to the fee requested from any class member. The fee and disbursements originally requested and the supplemental fee and disbursements are awarded. The total awarded is $1,645,-600.38.

█ In making this award the court has taken into consideration the following factors: 1) the legal services actually rendered; 2) the number of hours spent by partners and associates; 3) the hourly rates normally charged by the partners and paid to associates for non-contingent complex litigation; 4) the complexity of the issues involved; 5) the quality of the legal work;

6) the competence and skill of plaintiffs' counsel; 7) the contingent nature of the compensation and the risks assumed; 8) the length of time the cases have been in litigation; 9) the amount recovered for the class; 10) the proportion of the fee award to the settlement fund; and 11) the amount and proportion of fees awarded in similar cases. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).

The first of these five actions was filed on October 4, 1966 and the last in 1968. Even before the actions were certified as class actions, there was a motion to transfer these 5 cases and 8 other cases to California. Thereafter the instant 5 actions were declared maintainable as class actions and the other 8 actions stayed, pending the outcome of these 5 cases.[2] Three classes arising out of these 5 cases were delineated: One class consisted of those who purchased Douglas stock from January 19 to September 29, 1966; another class consisted of those who held 4% Douglas debentures worth about $300,000.00 and who converted them into common stock between April 13, 1966 and May 3, 1966; and a class consisting of the purchasers of $75,000,000. 4¾% debentures issued on July 12, 1966, divided in three subclasses.

There were numerous claims of false and misleading statements and omissions made by the plaintiff classes against defendant Douglas Aircraft, later McDonnell-Douglas. Among these were alleged inflated annual and interim income statements, manipulative dividend increase, falsely optimistic predictions, a false prediction that Douglas would break-even in 1966, misleading statements about use of proceeds of $75,000,000 debenture sale, and failure to disclosed pre-tax loss of more than $7,500,000. All of these, it was alleged, improperly increased the trading price of Douglas' stock and misled the purchasers of the debentures and those who converted their debentures into stock. These claims were asserted under both Section 11 of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934.

---

**2.** The 8 cases which were stayed were dismissed in 1976 after the settlement agreement

was reached and the individual plaintiffs included in his or her appropriate class.

There were three trials. The first trial involved Douglas' liability under the Section 11 claim of 4¾% debenture holders in which plaintiffs prevailed. The second trial related to the amount of damages to be awarded under the Section 11 claim. The third trial related to Douglas' liabilities under Section 10(b). This third trial was based upon the evidence adduced at the first trial. Shortly before proceeding to a trial of the damages to be awarded with respect to the Section 10(b) action, these cases were settled.

Most of the legal services were rendered by lead counsel for the plaintiffs.

As set forth above, those legal services are detailed in the affidavits of two lawyers from the lead counsel firm of Pomerantz Levy Haudek & Block, one from Mr. Abraham L. Pomerantz and the other from Robert B. Block. These services were rendered over a period of more than 10 years. In addition to the transfer motion made by Douglas, the motion for class certification, the motions for discovery and inspection, and the three trials, there was extensive discovery in the form of numerous depositions of the officers of Douglas, written interrogatories, production of hundreds of documents, and numerous pretrial conferences. There was also an appeal from the court's original order regarding the size of the notice to the class. There was a hearing on the fairness of the settlement and two hearings on motions to compel payments of the settlement fund and its reallocation and a motion to reform or rescind the settlement agreement and return part of the $5,000,000 to Douglas because of the paucity of claimants.

Once the case was settled and notice was given to class members to file their claim forms, it became the task of plaintiffs' counsel to supervise the processing of these claims by a firm hired for this purpose. The court ordered, as a result of the Douglas motion to reform or rescind the settlement amount, further publication of the notice of settlement in an effort to secure additional claimants. Additional claims were filed, making a total of about 1800 claimants.

In connection with all of these motions, trials and hearings, briefs of good quality were regularly and promptly filed and orders prepared to effectuate the court's decisions by plaintiffs' counsel.

The complexity of some of the issues involved in this protracted litigation is reflected in the various decisions written by this court. *Herbst v. Able*, 278 F.Supp. 664 (S.D.N.Y.1967); *Herbst v. Able*, 45 F.R.D. 451 (S.D.N.Y.1968); *Herbst v. Able*, 47 F.R.D. 11 (S.D.N.Y.1969); *Herbst v. Able*, 49 F.R.D. 286 (S.D.N.Y.1970); *Herbst v. Able*, 63 F.R.D. 135 (S.D.N.Y.1972); *Levy v. Douglas*, [1972–1973 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 93,700 (S.D.N.Y.1972); *Herbst v. Able*, [1973 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 93,923 (S.D.N.Y.1973); *Beecher v. Able*, 374 F.Supp. 341 (S.D.N.Y. 1974); *Beecher v. Able*, [1973–1974 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,584 (S.D.N.Y.1974); *Beecher v. Able*, [1974–1975 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,016 (S.D.N.Y.1975); *Beecher v. Able*, [1975–1976 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 95,303 (S.D.N.Y.1975); *Beecher v. Able*, 72 F.R.D. 518 (S.D.N.Y. 1976). Among these was whether Douglas' break-even forecast was false and misleading and the liability of Douglas for same under both Section 11 and Section 10(b), and the measure of damages under Section 11.

The work of plaintiffs' counsel in these cases, as reflected in the discovery proceedings, in the presentation of evidence and oral arguments at the trial was of the highest quality. It can not be disputed that two of the lead counsel for plaintiffs, Mr. Pomerantz and Mr. Block, are regarded by the legal profession as among the most competent and the most skillful lawyers in litigation of this kind in the country. Both have participated extensively in similar litigation in the past and have recovered similar awards and similar fees in other cases. Their regular hourly rates for complex litigation involving substantial sums of money are, therefore, among the highest known to the profession.

These actions were taken on a contingent fee basis, including the fees of the accountants. The settlement agreement was not reached until the cases had been in litigation 10 years. Thus, it was not until the settlement agreement was finally approved by the court that plaintiffs and their counsel were assured of any award. The amount of the recovery for the class, $5,000,000, was, as this court has already found, fair and reasonable settlement in view of the novelty of the major issues and the consequent lack of assurance that this court's favorable decisions for plaintiffs would be affirmed on appeal.

The negotiations which finally culminated in a settlement fund of $5,000,000 involved at least a year of such negotiations. Plaintiffs' counsel had the responsibility of replying to all inquiries made to the court over the years in addition to letters relating to the processing of the claims. Finally, plaintiffs' counsel has the responsibility for supervising distribution of the settlement fund.

There were nine lawyers in the lead counsel firm which represents plaintiffs in the *Beecher & Herbst* actions and who worked on these cases over the years. They put in a total of 6,148 hours and 50 minutes. These hours were valued at a total of $915,-132, using the non-contingent litigation rates. The supplemental affidavit shows a total of 47 and ½ hours valued at $24,-537.50, at the non-contingent rate, but then valued at three times that figure, or $73,-500, to reflect the unusual risk or contingency factor involved. Plaintiffs claim that the motion made by Douglas to reform or rescind the settlement agreement put in jeopardy the $5,000,000 settlement award. This added, they claim, an extra special risk factor justifying a multiplier of 3 with respect to the normal fee award. The court agrees.

The partners and associates who are counsel in the *Levy* action, Linden and Deutsch, and the predecessor firm, Bergerman and Hourwich, totaled 1,555 and ¼ hours. They seek a combined fee of $185,-000. The time spent by the firm of Milberg and Weiss, counsel in the *Gottesman* case, totaled 463.25 hours. They seek a fee award of $80,000.00. The firm of Weinstein and Levinson, counsel in the *Kobre* case, devoted 676½ hours. They seek a fee award jointly with the lead counsel firm bringing that total to $1,000,000. The accountants for plaintiffs in these cases, David Berdon and Company, totaled 1,762 hours of partner and 106 hours of staff member time. They value these hours at a total of $178,600, using normal rates. However, they now seek a total fee of $250,000 based upon several factors:

(a) the substantial time devoted to this engagement, principally by two partners of the firm;

(b) the substantial benefits achieved for the security holders of Douglas in respect of which the firm made an outstanding contribution;

(c) the fact that the compensation of the firm was wholly contingent on the successful outcome of the litigation;

(d) the fact that the services rendered by the firm were highly specialized, requiring special abilities and skills of two partners; and

(e) the extraordinary pressures and personal sacrifices demanded by the engagement.

The court agrees that these factors merit the additional consideration requested.

The combined disbursements requests, as set forth in the affidavits, amount to $71,-798.05. The supplemental affidavit filed by lead counsel seeks an additional $302.33 for disbursements. All disbursements are allowed.

The total fee request amounts to approximately 30% of the total award, including interest. This includes the award to the accountants of $250,000. Consequently the total fees for the lawyers involved is approximately 25% of the settlement award.

In their brief in support of this joint application, plaintiffs' counsel have set forth a number of similar cases in which similar large fee awards representing between 20% to 30% of the recovery have

been made and in which the courts have taken into account the risk factor. This factor has resulted in a substantial adjustment upward from the non-contingent hourly billing rates in complex cases. Consequently, the court finds that the award now made in this case is not out of line with awards in similar cases. *See, e. g., Doughboy Industries, Inc. v. American Cyanamid Corp.,* 1975–2 Trade Cases ¶ 60,452 (D.Minn. 1975); *In re Gypsum Cases,* 386 F.Supp. 959 (N.D.Calif.1974); *Arenson v. Board of Trade of the City of Chicago,* 372 F.Supp. 1349, 1358 (N.D.Ill.1974); *Fried v. Utilities Leasing Corp.,* [1976–1977 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,695 (E.D.Pa. 1976); *Stull v. Baker,* 410 F.Supp. 1326, 1338–9 (S.D.N.Y.1976); *Rosenfeld v. Black,* 56 F.R.D. 604, 605–6 (S.D.N.Y.1972); *Seiffer v. Topsy's International, Inc.,* 70 F.R.D. 622, 635 (D.Kans.1976); *Handel v. Gold,* [1975–1976 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,444 (S.D.N.Y.1976); *Hawk Industries, Inc. v. Bausch & Lomb, Inc.,* [1975–1976 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,306 (S.D.N.Y.1975); *McCausland v. Shareholders Management Co.,* [1973– 1974 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,580 (S.D.N.Y.1974); *Siegel v. Realty Equities Corp. of N. Y.,* [1973 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,102 at p. 94,447 (S.D.N.Y.1973).

The Second Circuit has expressly approved the awarding of an adequate fee in securities litigation of this kind in order to encourage private attorneys to undertake such litigation which, in the final analysis, is for protection of the investing public. *See, e. g., Grace v. Ludwig,* 484 F.2d 1262, 1267 (2d Cir. 1973), *cert. denied,* 416 U.S. 905, 94 S.Ct. 1610, 40 L.Ed.2d 110 (1974); *Dolgow v. Anderson,* 43 F.R.D. 472, 487 (E.D.N.Y.1968); *Rosenfeld v. Black,* 56 F.R.D. 604, 605 (S.D.N.Y.1972).